1 A.3d 572

**Monti Mantrice FLEMING**

v.

**STATE of Maryland.**

**No. 899, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Aug. 4, 2010.

78

Brian A. Zemil of Towson (David S. Gray, Venable LLP of Baltimore, MD, on the brief), for Appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for Appellee.

Panel: EYLER, DEBORAH S., WOODWARD and IRMA S. RAKER (Retired, Specially Assigned), JJ.

RAKER, J.

In this criminal case, appellant Monti Mantrice Fleming appeals his conviction for murder in the first degree. He raises three issues for our consideration:

"I. Did the lower court err by using the Frye–Reed test to prohibit Fleming from cross-examining the State's toolmark examiners about another method of toolmark identification that they chose not to use?

II. Did the lower court err by admitting expert opinions based on a fundamental assumption and methodology

that the scientific community does not generally accept as reliable?

III. Did the lower court abuse its discretion by denying Fleming's motion for mistrial when a police detective testified that she found two of the State's witnesses 'to be credible?' "

Although appellant raises interesting issues in this appeal, assuming without deciding that the trial judge erred with respect to the toolmark identification issues, this case is a textbook "harmless error" appeal and we shall so hold. We shall hold also that the trial court did not abuse its discretion in denying appellant's motion for a mistrial.

## I.

The Grand Jury for Howard County indicted appellant in connection with Shawn Powell's murder. Appellant was convicted of first-degree murder, using a handgun in the commission of a crime of violence, and wearing, carrying or transporting a handgun.

We set forth the facts in great detail to put our holding in perspective. In the late evening of August 26, 2006, appellant was involved in an altercation with the victim, Shawn Powell, in the Barnside town home neighborhood in Columbia. Several people witnessed appellant hitting Shawn Powell in the head with a glass bottle, and then drawing a gun and shooting between four and six shots in the direction of the retreating Powell. Shawn Powell was found dead at the foot of a stockade fence in a nearby yard at approximately 8:00 a.m. the following day, having died as a result of a single gunshot wound to his back.

In discovery, the State indicated that it intended to call expert witnesses in the field of firearm toolmark examination to establish that a gun which appellant gave to his step-grandfather, Willie Brown, shortly after the murder, was the same weapon that fired the fatal shots. Appellant filed a motion *in limine* to challenge the admissibility of that testimony.

The State called Torin Suber and Michael Nickol as expert witnesses to link the handgun recovered from Willie Brown's home with both shell fragments recovered from Powell's body, and firearm cartridge cases recovered from the scene. Appellant argued that the method of firearms toolmark analysis the State's expert witnesses used, "side-by-side, or split-screen comparative microscopic matching," was unreliable and that the examiners should have used an alternative methodology, "consecutive matching striae" (hereinafter "CMS").

The court held a three-day *Frye–Reed* hearing in January of 2008. Defense counsel cross-examined the State's firearms identification experts regarding their professional experience and the firearms identification technique they applied.

After considering the testimony of the State's witnesses, as well as scholarly articles discussing the state of the forensic firearms analysis field, the trial court concluded that the expert testimony using the traditional comparative microscopic matching technique was admissible under *Frye–Reed.* The court stated as follows:

"After hearing argument from both parties and considering the evidence, including the many articles on the subject, the court finds here that the State has met its burden of proof showing that the traditional pattern matching for determining forensic firearms analysis employed by the Maryland State Police is generally accepted in the relevant scientific community, and is almost exclusively used by forensic laboratories in Maryland."

The court further found that both of the State's experts were qualified to testify as expert witnesses, concluding as follows:

"Under Rule 5–702 [1] ... there is sufficient factual basis from Mr. Suber and [Mr. Nickol] ... that would qualify

1. Md. Rule 5–702. Testimony by experts.

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill,

[them] as [experts] by knowledge, skill, experience, and training, that there is a sufficient factual basis."

The circuit court concluded that CMS is not generally accepted within the scientific community and declined to require the use of the CMS methodology under *Frye–Reed*, reasoning as follows:

"CMS is not a predominant ... methodology. It has only been propounded since 1997 and as noted in [*United States v. Diaz*, No. CR 05–00167, 2007 WL 485967, *11–12, 2007 U.S. Dist. LEXIS 13152, at *36–37 (N.D.Cal. Feb. 12, 2007)], it is still a work in progress, a school of thought that is evolving."

At the *Frye–Reed* hearing, defense counsel indicated that he planned to cross-examine the State's expert witnesses about the CMS technique during the trial on the merits, even though the witnesses did not use the CMS technique. The trial judge responded that he would be unlikely to allow this line of questioning:

[DEFENSE COUNSEL]: With regard to the CMS issue solely, to the extent that Your Honor has found that it is not generally accepted, I would imagine that that would be an indication that Your Honor would sustain any objection from the State where I would say or question whether or not he has even applied that in this case.

[THE COURT]: I think under my—I will hear from the State, but I think that would be consistent with my ruling.

The trial commenced on January 29, 2008, before a jury in the Circuit Court for Howard County. The State called as witnesses Shade Webb, Starlette Webb, and Kanise Lewis, each of whom was present for the altercation between appellant and Shawn Powell on the night before Powell was found dead.

experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Shade Webb testified that she was in the area of the Barnside town homes on the night of Shawn Powell's murder, visiting her mother and her younger sister, Starlette, who lived in the neighborhood. She testified that she had known Shawn Powell approximately four years, "from school and from [the] Columbia neighborhood." She further testified that she knew who appellant was prior to the night of the incident, stating as follows:

[PROSECUTOR]: And had you known Monti Fleming prior to that evening?

[SHADE WEBB]: Not known him like we were friends, but know him from seeing him around the neighborhood.

On the night of Shawn Powell's murder, Webb met her sister at a friend's home in the neighborhood. The sisters walked to a nearby WaWa convenience store, and upon returning, conversed with other residents of the neighborhood on the sidewalk, including Shawn Powell. Shade testified that during or shortly after her conversation with Shawn Powell, Powell became embroiled in an altercation with appellant. She testified as follows:

[PROSECUTOR]: Did you stay at that area at that time with Shawn?

[SHADE WEBB]: Well, for a second. I was just asking him like what's going on, but I didn't know what the argument was about so I told him that I was going to walk up the sidewalk and when he got finished to just come up to the top of the sidewalk.

Soon thereafter, another young man, Dougie Roberts, appeared at the scene of the altercation, and reassured Shade Webb that "everything was cool." Shade apparently left the immediate scene of the altercation for a short but indeterminate period, and then returned to where appellant and Shawn Powell were standing. She stated as follows:

"I was still talking to Shawn and telling him to come on and they were still kind of going back and forth. All three of them were kind of going back and forth. That is when

Monti kind of like told me like, 'I'm just talking to him right quick, can you back off.' So I just left."

Shade walked back up the sidewalk to where her sister was standing. She described watching Shawn Powell start to walk away from appellant, up the sidewalk toward Ms. Webb. She testified that as Powell was walking away, appellant hit him in the back of the head with a bottle. She continued to watch as Shawn Powell then "hopped a fence," and appellant did so as well. She testified as follows:

[PROSECUTOR]: When the defendant hopped into the yard, what, if anything, did you see?

[SHADE WEBB]: Monti pulled out a gun out of his pocket.

[PROSECUTOR]: I'm sorry?

[SHADE WEBB]: Monti pulled a gun out of his pocket.

[PROSECUTOR]: And did you see from which pocket he pulled it out of?

[SHADE WEBB]: Right.

[PROSECUTOR]: His right pocket?

[SHADE WEBB]: Yes.

[PROSECUTOR]: And what happened then?

[SHADE WEBB]: He fired it.

[PROSECUTOR]: Did he hold—how did he hold it?

[SHADE WEBB]: He held it in his right hand and shot four.

[PROSECUTOR]: And he shot—in which direction did he shoot?

[SHADE WEBB]: Straight towards Shawn.

\* \* \*

[PROSECUTOR]: And did [Shawn Powell] stop, did he go on—

[SHADE WEBB]: No, he kept running.

[PROSECUTOR]: What did he do?

[SHADE WEBB]: He kept running.

Shade Webb testified that after appellant fired shots in the direction of Shawn Powell, he passed close by her before fleeing the scene. Shade testified as follows:

[PROSECUTOR]: [Appellant walked] [d]own the sidewalk? And was that in a direction towards or away from you?

[SHADE WEBB]: Towards me.

\* \* \*

[PROSECUTOR]: And was there a gun in his hand at this point?

[SHADE WEBB]: It was in his hand. Once he got—well it's not in the picture, but it's like a couple of porches, the steps where Kanise and Taylor was, he put it back in his pocket.

\* \* \*

[PROSECUTOR]: And when the defendant walked around the fence, how close were you to him?

[SHADE WEBB]: As close as me and the sheriff are.

[PROSECUTOR]: Indicating the sheriff to your left.

[THE COURT]: Four to five feet.

Starlette Webb, who was seventeen years of age at the time of her testimony, was present on the night of the altercation between appellant and Shawn Powell. Like her older sister Shade, she testified that from her vantage point on the sidewalk in the Barnside neighborhood, she witnessed the altercation, and stated, "I seen Monti hit Shawn on the back of the head with a—like a bottle." She stated that shortly thereafter, appellant pulled out a gun and fired "towards Shawn," approximately five times. She testified as follows:

[PROSECUTOR]: And what did he do after he put the gun in his pocket?

[STARLETTE WEBB]: He started to walk away, but he came like towards my direction.

[PROSECUTOR]: And did he—how close were you to him when he came towards you?

[STARLETTE WEBB]: I would say close; he walked past me.

[PROSECUTOR]: He walked past you?

[STARLETTE WEBB]: Yes.

[PROSECUTOR]: And did he say anything?

\* \* \*

[STARLETTE WEBB]: Yes.

[PROSECUTOR]: And what did he say?

[STARLETTE WEBB]: He said, "I'm not scared of none of these [expletive] out here."

Kanise Lewis, who was just a few feet from appellant when she saw him pull out the gun, testified as follows:

[PROSECUTOR]: Now, the Defendant hopped over the fence into the yard?

[KANISE LEWIS]: Uh-huh.

[PROSECUTOR]: And what did you see then, Ms. Lewis?

[KANISE LEWIS]: I seen him just raise [his] arm and start shooting towards the direction that Shawn walked.

Lewis positively identified appellant from a photo array that the police presented to her.

The State called as a witness appellant's step-grandfather, Willie Brown, who testified that appellant visited him and gave him a handgun in the days following Shawn Powell's murder. He stated that appellant arrived at his home for this purpose at approximately 11:00 a.m. on August 29, 2006, accompanied by a friend.

Howard County police evidence technician James Roeder testified to finding a trail of blood droplets linking the general area in which Shawn Powell was seen when he was running from appellant with the front yard garden where Powell was found dead. In addition, the State and defense stipulated that DNA analysis indicated that this blood was attributable "only" to Shawn Powell. Roeder stated that he recovered six shell casings from the crime scene.

Howard County detective Vicki Shaffer testified that during her investigation of Shawn Powell's killing, both Webb sisters identified appellant based on a single photograph the police presented to them. Defense counsel questioned the witness concerning the potentially suggestive nature of this single-photo identification method, and the following exchange transpired:

[DEFENSE COUNSEL]: And I know you've indicated that you believe that Starlette Webb knew Monti Fleming, isn't that correct?

[DET. SHAFFER]: That was my understanding, yes.

[DEFENSE COUNSEL]: And typically—and you make this decision, obviously, investigatively, but when you want to make sure the person isn't confused or may not wrongfully identify somebody, you use a photographic array so that the person isn't just shown one photograph, isn't that correct?

[DET. SHAFFER]: Not if—not if they can assert that they have historical knowledge of who the person is.

[DEFENSE COUNSEL]: And because they say it, you just assume that they do, correct?

[DET. SHAFFER]: *I found them to be credible.*

Defense counsel moved immediately for a mistrial based on this response by Det. Shaffer, which he characterized as an attempt by her to "bolster" the credibility of the State's other witnesses. The court declined to grant a mistrial, reasoning as follows:

"[Defense counsel's] question was . . . if someone is going to be confused . . . you use a photo array and not show them one [photo], and [Det. Shaffer] is saying I didn't do it because of historic knowledge, and I found [Shade and Starlette Webb] even to be credible. She may have used the word 'witness,' but I took it in the context of her response to the question as to why she didn't use the photo array. In other words, she's saying . . . that the witness here had prior knowledge and that . . . Starlette knew, had known Mr. Fleming previously, and that she's saying that's

the reason why she was verifying it. So I would deny a mistrial at this point. I'd be happy to give a limiting instruction at this point."

Appellant declined the court's offer to supply a limiting instruction, stating that it would only serve to accentuate the harm flowing from Det. Shaffer's statement.

At trial, defense counsel proposed to cross-examine the expert witnesses in connection with the "alternative" CMS firearms toolmark analysis technique. The court did not permit this line of cross-examination, and defense counsel proffered as follows:

[DEFENSE COUNSEL]: I would proffer that I would ask him about [his] experience and his understanding [inaudible] training [inaudible] CMS, and the substantive knowledge that he—that he has regarding it, and I would incorporate into that proffer the testimony that was generated at the motions hearing.

[THE COURT]: Okay ... you'd be asking about the science and literature ... you'd be asking, one, if he's aware of that?

\* \* \*

[DEFENSE COUNSEL]: I would proffer that I would ask questions concerning his education, training and experience regarding CMS and his substantive knowledge about the methodology.

\* \* \*

[THE COURT]: Yeah, I think to be ... consistent, and as I understand the application of *Frye–Reed*, I have to be consistent with my ruling that we spent some time on. I wouldn't permit a specific ... reference to [CMS] ... as a school of thought or something that may be recognized. As I indicated, though, I think questions concerning the nuts and bolts of ... compilation of results, and statistical analysis ... can be asked. But I don't think it can be— referenced that ... there's a school of thought out there that may be recognized in other jurisdictions.

The State's case against appellant consisted of eyewitness testimony from witnesses who knew appellant, the circumstantial evidence from appellant's step-grandfather with respect to the handgun, the blood evidence, and the firearms identification evidence. The defense at trial did not appear to be the classic "who dunnit" but rather, whether appellant, a fifteen year-old at the time of the shooting, harbored the specific intent to harm. In closing argument, defense counsel made clear to the jury that the defense was not contesting whether appellant was the shooter, but instead, asked the jury to consider whether appellant really intended to harm the victim. Accordingly, defense counsel conceded explicitly that appellant was criminally liable for Shawn Powell's death, in some degree.

Defense counsel's objective was to avoid a conviction for first-degree premeditated murder. His closing argument proceeded as follows, in relevant part:

"There is evidence that certainly, strongly suggests that Monti Fleming on the 26th of August, 2006 had a gun, and that he fired that gun, and that as a result of that Shawn Powell has died. I acknowledge that. Starting at that point, I ask you now to listen to me as to why the statement that I made at the beginning of this trial is true. *That this young fifteen year-old, who had a gun in his hand, didn't have a premeditated, willful, and deliberate specific intent to kill Shawn Powell.*

\* \* \*

I think the inconsistencies become important because it gets to the issue of what it is that I truly believe at some point you're going to find Monti Fleming guilty of. If it was as simple as first-degree murder, boom, we wouldn't need a trial. *I didn't stand up here at the beginning of this trial and say ladies and gentlemen of the jury, at the end of the evidence ... I'm assuring that you will find my client not guilty of each and every charge.* As I said, I'm a human

being, I'm a realist. I sat through the same trial that you did.

\* \* \*

There is a presumption of innocence that carries through the entire trial. That soon will fade away, and I'm confident, unfortunately, I am confident that there will be in some ways a presumption of guilt based on the evidence. The issue that you will decide is what it is that Mr. Fleming is guilty of.

\* \* \*

There is a reaction that each of you will have. It's got to be offensive. No matter whether the person is fifteen years of age, or twenty-five years of age or forty-five years of age, that a person would take a firearm out of his pocket and start shooting in the direction of another human being. That I acknowledge. But, see, now I have to bring us all back to this issue of the responsibilities of being a juror.... The reason that that's important is because of the degrees that you've been given. *That you have this impulsive act by a fifteen year old and there is nothing to suggest otherwise.*

\* \* \*

[I]f he wants to kill Shawn Powell, he can keep moving. He can keep tracking him down and he can actually stand over him and do the job.... Instead he hops over a fence, he pulls out a gun and starts shooting. Now tragically, one of the bullets does strike Shawn Powell.

\* \* \*

So that all goes into the ultimate decision that you make. Not that was there a death, and did Monti Fleming cause the death of Shawn Powell. So, as I said, you're going to make that conclusion. You're going to reach that conclusion very quickly, because the evidence strongly supports that.

\* \* \*

Now, I do believe that you're going to come to a conclusion and *I've said this, that Monti Fleming discharged a fire-*

*arm, and as a result of that Shawn Powell then was—he died.* It's tragic, and I'm sorry that it happened.

\* \* \*

*[I] believe and I know that the facts that have been given to you support a conclusion that Monti Fleming is responsible for the death of Shawn Edward Powell. But it does not, and it cannot support a conclusion that it was premeditated, willful and deliberate.*

\* \* \*

I ask that the fact that the jury instructions and the law in this State that has been given to you in the form of jury instructions, give to you what it is that ultimately your conclusion will be. And it is that there was a death; Monti Fleming was responsible for it, but it was not premeditated, willful or deliberate.

\* \* \*

[T]he facts in this case combined into law will allow you the benefit of making a very difficult decision, but the right decision. *And that is that Monti Fleming is not guilty of premeditated first-degree murder, but he is responsible for the death of Shawn Powell. Whether that's second degree murder or involuntary manslaughter will be within your decision and your domain.*

\* \* \*

Although Monti Fleming at the age of fifteen did something that is regretful and terrible and tragic, he didn't willfully with deliberation and premeditation want to kill Shawn Powell, but unfortunately he did. For that he will be convicted of a crime. That crime should not be premeditated first-degree murder. Thank you."

Appellant was convicted of first-degree murder, use of a handgun in the commission of a crime of violence, and carrying a handgun. The court sentenced appellant to a term of life imprisonment, with all but fifty years suspended, on the first-degree murder count; a consecutive twenty-year term of incarceration, with all but five years suspended, for the use of

a handgun in a violent felony; and a concurrent five-year term of incarceration for wearing and transporting a handgun. The court merged the remaining lesser-included offenses for sentencing purposes. Appellant filed a timely notice of appeal to this Court.

## II.

We consider the issues presented by appellant in inverse order, and address first his argument that the trial court erred in not granting his motion for a mistrial when Detective Shaffer stated that she found State witnesses Shade and Starlette Webb "to be credible." Initially, we must address the State's contention that the matter has not been preserved for appellate review, because defense counsel refused the court's offer to provide a limiting or curative instruction.

When the circuit court declined to grant appellant's motion for a mistrial, it did so in the context of the following discussion:

[THE COURT]: So I would deny a mistrial at this time. I'd be happy to give a limiting instruction at this point or—

\* \* \*

[DEFENSE COUNSEL]: Excuse me, Your Honor. I don't think it will adequately address it. But in any event, for the record in the future, I'm not asking for [a] limiting instruction because I had requested, as well as the State, a credibility of witnesses instruction be presented. So, therefore, rather than highlight to the jurors at this time to a limiting instruction, I think the same information will be conveyed at a later time, and I'm not attempting to waive the issue I'm raising. Obviously, the court has denied a mistrial. The court has inquired whether or not I'd like a limiting instruction. I think a limiting instruction would only alert the jurors as to the information that I have moved for mistrial on, and in the event the appellate court believes that by not asking for a limited instruction, I've actually waived the issue and sort of eliminated my request for a mistrial, I want the record to adequately reflect that I

believe that the credibility of witness instruction ... will be the same ... information—

[THE COURT]: That will be given at the end.

[DEFENSE COUNSEL]: And so therefore, rather than having a limiting instruction at this time, the credibility of witness instruction will address my concerns rather than ask for a limiting instruction at this time.

The State maintains that because defense counsel strategically declined a "curative instruction," the issue is not preserved for appellate review. The State's view as to curative instructions and waiver is wrong. We hold that the issue is preserved for appellate review.

The Court of Appeals has addressed a parallel situation, and held that an objection to the admissibility of the contested evidence was not waived. The Court reasoned as follows:

"[W]e must consider the State's contention that the defendant waived the right to raise the issue of other crimes evidence because defense counsel refused the trial judge's offers to give a limiting instruction. The State argues that for strategic reasons defense counsel chose to 'transform an adverse ruling that could have been given a limited effect into a general defeat in hopes of turning it to his advantage at trial or on appeal.' *We fail to see, however, how this decision not to accept the instruction constitutes a waiver.* It was clear to defense counsel that the proposed instruction could have had the undesirable effect of highlighting the purposes suggested by the trial judge: intent, knowledge, common scheme, or explanation for not having pled guilty."

*Terry v. State,* 332 Md. 329, 333–34, 631 A.2d 424, 426 (1993) (emphasis added). A defendant is not required, as a matter of law, to agree to a limiting instruction at the risk of waiving an issue for appellate review. A trial court may, and sometimes should, give a curative instruction on its own. Each case will be reviewed on its own merit, but counsel's tactical decision to minimize the damage by avoiding emphasis of the statement will not be considered a waiver of the issue.

▇▇▇ We turn now to the merits of the question whether the trial court abused its discretion in declining to grant a mistrial based on Det. Shaffer's statement that she found the Webb sisters to be "credible." A trial court may grant a mistrial where such a measure is "necessary to serve the ends of justice." *Jones v. State*, 310 Md. 569, 587, 530 A.2d 743, 752 (1987). The defendant bears the burden of showing that the prejudice arising from the trial court's error demands the declaration of a mistrial. *Hunt v. State*, 312 Md. 494, 503, 540 A.2d 1125, 1129 (1988). This Court reviews a trial court's decision to decline to grant a mistrial under an abuse of discretion standard. *See Walker v. State*, 373 Md. 360, 378, 818 A.2d 1078, 1088–89 (2003).

Appellant claims that the trial court erred in declining to grant a mistrial based upon Det. Shaffer's "bolstering" of two other State's witnesses, Shade and Starlette Webb, because her statement that she found the sisters to be "credible" invaded the exclusive role of the jury to determine the credibility of witnesses. Appellant argues that this experienced detective must have known better than to inject her own opinion as to witness credibility, and that it was probably a purposeful statement calculated to influence the jury.

The State argues that the detective's response was an appropriate one in light of the question asked, and that her statements were not calculated to "bolster" improperly the credibility of Shade and Starlette Webb. Therefore, the State argues, the trial court did not abuse its discretion in declining to grant a mistrial.

The detective's comment arose in the context of defense counsel probing the detective's reason for showing a single photograph, instead of a photographic array, to Shade and Starlette Webb. Her reason for showing a single photo was that she believed the witnesses knew appellant prior to the shooting incident. Counsel asked her the following question, eliciting the following response:

[DEFENSE COUNSEL]: And because they say [that they know the suspect], you just assume that they do, correct?

[DET. SHAFFER]: I found them to be credible.

Defense counsel objected immediately, arguing that Det. Shaffer's statement "bolstered" the credibility of Shade and Starlette Webb. The following discussion transpired:

[DEFENSE COUNSEL]: Your Honor, I'm going to move for a mistrial based on this witness's response, which was an effort ... it only required a yes or no answer. It didn't require a "I found her to be credible." And so as a result of her making an unsolicited effort to try to bolster the testimony of the State's witnesses, I'm moving for a mistrial, Your Honor.

[PROSECUTOR]: Certainly, the State would be opposed to that request, Your Honor. I would point out that the line of questioning was limited to the—as Detective Shaffer points out, the historical knowledge of the Defendant. She did not comment on the credibility of the witnesses as to the event that occurred.

[THE COURT]: Let me make sure—you're saying your basis is because of her comment that she found her to be a credible witness.

[DEFENSE COUNSEL]: She says the witnesses are credible.

 * * *

[THE COURT]: I mean, that certainly is I think permissible, putting it in context of what was being asked, I think that's an explanation that I think it can be cleared up. I'll give you the opportunity to clear it up. You can renew it if you feel it isn't done appropriately.

 * * *

[DEFENSE COUNSEL]: It's inconsistent with my request for a mistrial and, and ultimately the Court—I guess I first, would ask the Court to rule on my request for a mistrial.

 * * *

[PROSECUTOR]: Your Honor, I don't think that in any way it could be misconstrued that Detective Shaffer is vouching for the credibility of the information that was

provided to the jury during the course of this trial. Certainly, she didn't hear it and she wasn't in the courtroom....

\* \* \*

[THE COURT]: I certainly agree. I mean, it was a response. Your question was basically don't ... you typically think—if someone is going to be confused, you use a photo array and not show them [only] one [photo], and she's saying I didn't do it because of historic knowledge and I found her even to be credible. She may have used the word "witness" but I took it in the context of her response to the question as to why she didn't use the photo array.

\* \* \*

[THE COURT]: So I would deny a mistrial at this time. I'd be happy to give a limiting instruction at this point....

The detective's response was an appropriate answer to the question propounded by defense counsel, and it does not appear to have been said with the intent to bolster the testimony of the Webb sisters. The detective explained why she showed the sisters only a single photo—because the sisters told her that they knew appellant, and the sisters' statements that they knew him were "credible" to her. Counsel asked her a question, and he received her answer. Counsel's predicament is the classic example of the old saying, "don't ask a question to which you do not know the answer." The trial court did not abuse its discretion in refusing to grant a mistrial.

## III.

In appellant's view, the central issue in this case is the toolmark identification evidence. Such evidence is relevant, ordinarily, to connect a weapon, bullets and shell casings to a particular individual. The probative value of that evidence in this case is to establish that appellant was the person who fired the gun from which the fatal bullets were shot. The problem is that criminal agency was not a significant issue in the case, and any error related to the firearm toolmark

testimony, if there was error, was harmless beyond a reasonable doubt.

Especially in light of defense counsel's closing argument, the criminal agency of appellant was no more than a technical issue, at best, in this case. The only issue the jury had to consider seriously, based on appellant's counsel's closing argument, was appellant's intent in firing the weapon, and not whether he in fact fired the gun. After a consideration of all of the evidence presented in the case, we hold that even assuming *arguendo* that the trial court erred in either admitting the expert testimony, or in limiting the cross-examination of the experts, any such error was harmless beyond a reasonable doubt.

 Where a trial court errs by admitting inadmissible evidence, the error may, but will not necessarily, result in a reversal of a resulting conviction. *See Moore v. State*, 412 Md. 635, 666, 989 A.2d 1150, 1167 (2010) (stating that "not every error committed during a trial is reversible error."). The Court of Appeals set forth the standard for making this determination as follows:

> "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict."

*Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976); *see also Parker v. State*, 408 Md. 428, 446, 970 A.2d 320, 331 (2009). In other words, "[t]o say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Bellamy v. State*, 403 Md. 308, 332, 941 A.2d 1107, 1121 (2008).

■ Although providing a full opportunity for cross-examination is the principal means of implementing a criminal defendant's constitutional right of confrontation, errors in defining the scope of cross-examination are subject to harmless error review. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (stating that "the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."); *Owens v. State*, 161 Md. App. 91, 111–12, 867 A.2d 334, 345–46 (2005) (stating that "if the examination was erroneously restricted, we then apply a harmless error standard of review.").

The firearm toolmark identification testimony in this case was icing on the State's cake, and without that evidence, the jury would have had no problem concluding that appellant fired the fatal shots that killed Shawn Powell. As to the limitation on cross-examination of the experts, the best appellant could have achieved by cross-examining the State's witnesses about the CMS method was to show that there are valid concerns about the subjectivity of traditional firearms identification evidence, and that there is an emerging, but not generally accepted branch of the discipline that aspires to greater objectivity.

The State presented three eyewitnesses to the shooting, each of whom positively identified appellant. Two of the three, Shade and Starlette Webb, testified that they knew appellant prior to the shooting incident; the other, Kanise Lewis, identified him from a photographic array three days after the shooting. All three witnesses testified to seeing or hearing appellant hit Shawn Powell in the head with a bottle, and all three testified to witnessing appellant shoot in the direction of Powell, who was by that time walking or running away. Their descriptions of this event are consistent with Shawn Powell's fatal injury, which was a gunshot wound to the back.

The geographic point in the Barnside neighborhood from which the witnesses claimed to have watched appellant shoot at Shawn Powell is located a distance of yards from where Shawn Powell was found dead at 8:00 a.m. the following day. As James Roeder testified, a trail of blood droplets attributed by DNA analysis to Shawn Powell linked the approximate area in which he was seen when he was running from appellant, with the yard where he was found dead.

The testimony of appellant's step-grandfather, Willie Brown, was that appellant brought him a handgun for him to store or sell within three days after the shooting. The recovered .380 caliber handgun was capable of firing .380 caliber rounds, casings for which were located around the area from which appellant fired at Shawn Powell. Appellant's delivery of a gun, three days after the fatal shooting, is additional circumstantial evidence of guilt.

In sum, the State's eyewitness testimony in this case was overwhelming, and defense counsel conceded that appellant fired the weapon and caused Shawn Powell's death. In addition, the weapon was linked to appellant through appellant's step-grandfather. We hold that even assuming error in admitting the firearm testimony or limiting the cross-examination, any error was harmless beyond a reasonable doubt.

## IV.

So there is no misunderstanding, even if the admission of the State's firearm expert testimony was not harmless, we would hold that the trial court did not err. We have not been directed to any court in the country which has excluded such testimony.

Appellant argues that the firearms identification expert witness testimony was admitted improperly under *Frye–Reed,* because the methodology the State used, traditional comparative microscopy, is no longer "generally accepted as reliable" in the field, particularly in light of the advent of the CMS method.

The State argues that the firearms toolmark testimony was admitted properly under *Frye–Reed*, because the expert witnesses used the method traditionally used in Maryland, by both the Maryland State Police and the forensic laboratories located in Maryland. The State argues further that its reliability has been judicially noticed in Maryland.

The admissibility of expert testimony concerning scientific or forensic evidence is governed in Maryland by the *Frye–Reed* standard, which provides that scientific techniques can be admissible if they are "generally accepted" in the scientific community. *See Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923) (holding that with respect to scientific evidence, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."). The *Frye* standard was adopted in Maryland in *Reed v. State,* 283 Md. 374, 389, 391 A.2d 364, 372 (1978) (discussing the policy considerations behind the "general acceptance" requirement, and concluding that "[f]or the foregoing reasons, we agree with the 'general acceptance' rule which the *Frye* case sets forth."). The Court of Appeals has encapsulated the standard as follows:

"Where the validity and reliability is so broadly and generally accepted within the scientific community, as is the case of ballistics tests, blood tests, and the like, a trial court may take judicial notice of its reliability. Likewise, a court may take judicial notice that certain procedures, widely recognized as bogus or experimental, are unreliable."

*Clemons v. State,* 392 Md. 339, 363–64, 896 A.2d 1059, 1073 (2006). This Court reviews de novo the admission of expert evidence under *Frye–Reed. See id.* at 359, 896 A.2d at 1071; *Wilson v. State,* 370 Md. 191, 201 n. 5, 803 A.2d 1034, 1040 (2002).

Firearms toolmark identification [2] is the practice of investigating whether a bullet, cartridge case or other ammunition

---

**2.** This discipline is widely referred to as "ballistics," but this term has been described as a misnomer:

component or fragment can be traced to a particular suspect weapon. The "leading proponent" of the evidentiary use of firearm toolmark examination, and of the traditional comparative matching method in particular, is an organization called the Association of Firearm and Toolmark Examiners (hereinafter "AFTE"). *See United States v. Willock*, 696 F.Supp.2d 536, 553 n. 7 (D.Md.2010).[3]

The technique of firearms identification the State's witnesses applied in the case at bar is known as comparative microscopic matching. It consists of attempting to identify the "toolmarks" impressed upon the bullet fragments and cartridge casings often recovered from a crime scene, in an effort to determine whether the toolmarks impressed upon the evidence could have been created by a firearm that has been connected to a suspect. Toolmarks can be created by the "lands," or the raised parts in between the grooves of the rifling inside of a gun barrel, which "bite" into the surface of the bullet as it travels through the barrel. GIANNELLI & IMWINKELRIED, SCIENTIFIC EVIDENCE § 14.02, at 708. Toolmarks are also created on the cartridge casing by pressurized impact, which is caused by the breech face, firing pin, or the casing ejector. *Id.* § 14.02, at 717.

Generally, firearm toolmarks can be divided into three types of characteristics: class, subclass, and individual characteris-

---

"Although this subject is popularly known as "ballistics," that term is not correct. Ballistics is the study of the motion of a projectile. Interior ballistics concerns the study of the projectile within the firearm; and terminal (wound) ballistics concerns the study of the effects of the projectile on the target. Firearms identification does not directly involve ballistics."

P. GIANNELLI & E. IMWINKELRIED, SCIENTIFIC EVIDENCE § 14.01, at 707 (4th ed. 2007).

3. In *United States v. Willock*, 696 F.Supp.2d 536 (D.Md.2010), the United States District Court for the District of Maryland adopted in full a Report and Recommendation issued by Chief Magistrate Judge for the United States District Court for the District of Maryland Paul W. Grimm, as to the admissibility of firearms toolmark evidence in the complex, multiple-defendant criminal case pending before the district court. All citations to *Willock* refer to Judge Grimm's Report and Recommendation as adopted in that case.

tics. *See Willock,* 696 F.Supp.2d at 557–58. Chief Magistrate Judge Paul W. Grimm summarized the classification of toolmarks for firearms identification analysis purposes, as follows:

"Class characteristics are 'family resemblances which will be present in all weapons of the same make and model.' [*United States v. Monteiro,* 407 F.Supp.2d 351, 360 (D.Mass. 2006).] Examples of class characteristics include the bullet's weight and caliber; number and width of the lands and grooves in the gun's barrel; and the 'twist' (direction of turn, i.e., clockwise or counterclockwise, of the rifling in the barrel). *Diaz,* [2007 WL 485967, at *1] 2007 U.S. Dist. LEXIS 13152, at *2. Class characteristics that cause toolmarks on spent cartridge casings include the 'caliber, type of breech face, and type of firing pin.' *Id.* A breech face may be 'parallel, arched, smooth, granular, or circular,' and a firing pin can leave an impression that is 'circular, rectangular, [or] elliptical.' *Id.*

Subclass characteristics 'are produced incidental to manufacture' and 'can arise from a source which changes over time,' and therefore 'may be present on a group of guns within a certain make or model, such as those manufactured at a particular time and place.' *Monteiro,* 407 F.Supp.2d at 360; *see* [NATIONAL RESEARCH COUNCIL, NRC BALLISTIC IMAGING REPORT, p. 31 (National Academies Press 2008)] (defining subclass characteristics as having three characteristics: they are '[p]roduced incidental to manufacture'; (2) 'they relate to a small group source,' i.e., 'a subset of the class to which they belong'; and (3) they '[c]an arise from a source which changes over time'). An example would include imperfections 'on a rifling tool that imparts similar toolmarks on a number of barrels before being modified either through use or refinishing.' Ronald G. Nichols, *Defending the Scientific Foundations of the Firearms and Tool Mark Identification Discipline: Responding to Recent Challenges,* 52 J. FORENSIC SCI. 586, 587 (2007).

Individual characteristics are '[r]andom imperfections produced during manufacture or caused by accidental damage … which are unique to that object and distinguish it from

all others.' *Monteiro*, 407 F.Supp.2d at 360. However, non-unique marks may comprise individual characteristics, and wear and tear cause individual characteristics to change over time to some extent. Thus, the toolmarks made on a bullet or cartridge casing include marks imposed by all weapons of the make and model that fired the ammunition (class characteristics), marks common only to a subset of that make and model (subclass characteristics), and marks unique to the weapon that fired the ammunition (individual characteristics). *Id.*"

*Id.* (some internal citations omitted). The random imperfections in the bore of the firearm are theoretically unique to each firearm, and "the probability that another firearm would have identical bore imperfections is considered so remote that firearms identification examiners often conclude that a bullet has been fired from a particular firearm and could not have been fired by any other firearm." GIANNELLI & IMWINKELRIED, SCIENTIFIC EVIDENCE § 14.03, at 713.

In making the inquiry into the similarity or near-identity of toolmarks, a trained firearm toolmark examiner uses a "comparison microscope" to compare spent ammunition components recovered from a crime scene with ammunition components fired from the candidate firearm. *Monteiro*, 407 F.Supp.2d at 359. The beliefs which legitimize the examinations have been described as follows:

"The theory underlying firearm toolmark identification rests upon two propositions: (1) class and microscopic marks imparted to objects by different tools will rarely, if ever, display agreement sufficient to lead a qualified examiner to conclude the objects were marked by the same tool and hence a qualified examiner will rarely commit a false positive error (misidentification); and (2) most manufacturing processes involve the transfer of rapidly changing or random microscopic marks onto barrel bores, breech faces, and firing pins, thus providing firearms with distinctly unique toolmarks, which can be identified and matched by a trained examiner."

*United States v. Natson,* 469 F.Supp.2d 1253, 1260 (M.D.Ga. 2007).

Ultimately, the determination of whether a potential "match" exists is made by a trained examiner using a split-screen microscope to simultaneously compare the toolmarks on the crime scene evidence against the toolmarks produced by a test round fired by the subject firearm. Crucially, this is acknowledged to be a subjective determination. *See Monteiro,* 407 F.Supp.2d at 355 (quoting ASSOCIATION OF FIREARM AND TOOLMARK EXAMINERS, *Theory of Identification as it Relates to Toolmarks,* 30 AFTE J. 86, 86 (1998), for the proposition that the AFTE acknowledges that "[c]urrently the interpretation of individualization/identification is subjective in nature."); GIANNELLI & IMWINKELRIED, SCIENTIFIC EVIDENCE § 14.03, at 714 (stating that "the examiner's conclusion is essentially a subjective judgment."); *see also Willock,* 696 F.Supp.2d at 560–61; *United States v. Glynn,* 578 F.Supp.2d 567, 572 (S.D.N.Y. 2008).

The use of toolmark identification evidence has drawn scrutiny in recent years, and the argument appellant makes before this Court is characteristic of similar challenges occurring throughout the country. *See Willock,* 696 F.Supp.2d at 551 (noting that Professor Adina Schwartz has "testified at hearings and provided affidavits in numerous cases" concerning the admissibility of toolmark evidence, and citing examples of her participation in cases in California, Massachusetts, New Mexico, and New York). Congress commissioned a study of forensics evidence generally, which was published by the National Research Council in 2009. *See* NATIONAL RESEARCH COUNCIL, COMMITTEE ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIENCE COMMUNITY, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (National Academies Press 2009) (hereinafter "NRC Report"). With respect to toolmark analysis, the NRC Report concluded, "[b]ecause not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result .... additional studies should be performed to make

the process of individualization more precise and repeatable."
*Id.* at 154.

Although firearms identification testimony has remained widely admissible in the face of recent challenges, courts have expressed their reservations, sometimes strongly. *See, e.g., United States v. Glynn,* 578 F.Supp.2d at 574 (stating that "ballistics examination not only lacks the rigor of science but suffers from greater uncertainty than many other kinds of forensic evidence. Yet its methodology has garnered sufficient empirical support as to warrant its admissibility."); *United States v. Green,* 405 F.Supp.2d 104, 109 (D.Mass.2005) (stating, "I reluctantly come to the ... conclusion [that firearm toolmark evidence is admissible] because of my confidence that any other decision will be rejected by appellate courts ... [but] the more courts admit this type of toolmark evidence without requiring documentation, proficiency testing, or evidence of reliability, the more sloppy practices will endure; we should require more.").

The consecutive matching striae method of toolmark analysis can be viewed as either a supplement or an alternative to the traditional method of toolmark examination. Proponents of the CMS technique fault the traditional comparative microscopy technique for the inherent subjectivity of the examiner's ultimate determination. The CMS method, which can be used only on projectile remnants, calls for the examiner to consider the number of consecutive matching striae, or "scratches" appearing on a projectile fragment. The theory provides that a positive "match" determination can be made only when a certain, statistically established number of striae match. *See Monteiro,* 407 F.Supp.2d at 370 (explaining that "correspondence between one 6–line run of striae or two 3–line runs of striae permits an identification."). The CMS method thus endeavors to inject a greater degree of objective certainty into toolmark and firearm analysis.

While some proponents of CMS cast it as a wholesale improvement upon traditional comparative microscopy, this emergent firearms toolmark analysis method is not free from

criticism. For instance, Professor Schwartz, herself a leading proponent of CMS, illuminated the shortcomings of the CMS method in an affidavit filed in the United States District Court for the District of Maryland, in connection with a recent case which challenged the use of firearms identification evidence more generally. Judge Grimm summarized the contents of her affidavit in relevant part as follows:

"25. CMS, though better than the traditional subjective approach to toolmark identification, is nonetheless a 'highly imperfect attempt to incorporate statistical empirical data into toolmark identifications.'

26. There are questions regarding whether the CMS criteria were derived from databases that are relevant to and representative of firearm toolmarks.

27. CMS may not be a more objective method of toolmark identification, but rather a way for examiners to describe their subjective observations when comparing striated toolmarks.

28. Some argue that CMS is subjective because it essentially amounts to line-counting."

*Willock*, 696 F.Supp.2d at 553 (internal citations omitted). The report adopted in *Willock* went on to explain as follows:

"CMS analysis has yet to be adopted by a majority of toolmark examiners. . . . 'Although CMS is a widely accepted protocol which has been scientifically validated, it is not the predominant standard in the field according to AFTE.' *Id.* Further, '[t]o the critics, CMS necessarily involves some subjectivity' because an examiner must 'count points of identification and . . . different examiners might count points differently.' *Diaz*, [2007 WL 485967, at *12] 2007 U.S. Dist. LEXIS 13152, [at *37]."

*Id.* at 561.

Having considered the attributes of traditional microscopy as described above, and having considered the comparative virtues of the CMS method, if the issue was material to the case, we would hold that the trial court did not err in admitting evidence derived through the traditional comparative microscopic pattern matching technique. The Court of

Appeals has approved the admissibility of traditional firearms identification evidence under *Frye–Reed;* indeed, *Reed v. State* referred to "ballistics" as an example of a discipline for which "the validity and reliability is so broadly and generally accepted" that under the *Frye–Reed* standard, "a trial court may take judicial notice of its reliability." *Reed v. State,* 283 Md. at 380, 391 A.2d at 367. Although *Reed* was decided over thirty years ago, notwithstanding the current debate on the issue, courts have consistently found the traditional method to be generally accepted within the scientific community, and to be reliable.

Our view is consistent with recent federal precedent[4] in courts around the country, as well as in the United States District Court for the District of Maryland. For instance, in *United States v. Williams,* 506 F.3d 151, 161 (2d Cir.2007), the United States Court of Appeals for the Second Circuit held that the federal *Daubert* test was met as to firearms identification evidence even where the trial court denied the defendant's request for a hearing on the matter. The appeals court noted with approval that the trial court had considered another case, *United States v. Santiago,* 199 F.Supp.2d 101, 111–12 (S.D.N.Y.2002), which rejected a challenge to the admissibility of firearms identification evidence which characterized such evidence as a "pseudo-science." *Id.* A recent example from the United States District Court for the District of Maryland is *Willock,* 696 F.Supp.2d at 571, in which Judge Grimm discussed the limitations of traditional toolmark microscopic

---

4. The admissibility in federal courts of scientific evidence is determined under a different standard than that applied in Maryland courts. The federal test is derived from *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Nonetheless, the Court of Appeals has considered federal *Daubert* inquiries to be instructive, although certainly not dispositive, for purposes of admissibility in Maryland courts. *See, e.g., Blackwell v. Wyeth,* 408 Md. 575, 605 n. 19, 971 A.2d 235, 253 (2009), which stated as follows:

"[V]arious federal courts have had occasion to scrutinize the reliability of the analytical framework utilized by an expert in formulating a novel theory of science, and to them we turn, recognizing that they utilized the *Daubert* standard rather than *Frye.* We explore what they have opined, nevertheless, when they are speaking about reliability."

matching, but concluded, "I find that, despite its inherent subjectivity, the [Association of Firearm and Toolmark Examiners] theory of firearms-related toolmark identification ... has been generally accepted within the field of toolmark examiners...."[5] *See also United States v. Foster,* 300 F.Supp.2d 375, 377 n. 1 (D.Md.2004) (stating that "ballistics evidence has been accepted in criminal cases for many years, [and that in] the years since *Daubert,* numerous cases have confirmed the reliability of ballistics identification.").

Appellant submits CMS as an alternative or supplement to the traditional comparative microscopy method, but the existence of an alternative, even one which aspires to improve upon the shortcomings of its forebear, does not undermine the generally accepted nature of the traditional method.[6] Accordingly, in rendering its decision in the case at bar, the trial court noted correctly that the alternative method proposed by appellant was not truly an alternative, but rather an emerging refinement of the same technique. The trial court stated as follows:

---

5. Judge Grimm noted that "every federal court to have examined the issue in a written opinion (albeit with considerable differences in the amount of detail in the analysis)—[has] concluded that it is sufficiently plausible, relevant, and helpful to the jury to be admitted in some form." *Willock,* 696 F.Supp.2d at 568.

6. Judge Grimm's opinion in *Willock,* 696 F.Supp.2d 536, relied in part on the unpublished opinion of the Federal District Court for the Northern District of California, *United States v. Diaz,* No. CR 05–00167 WHA, 2007 WL 485967, 2007 U.S. Dist. LEXIS 13152 (N.D.Cal. Feb. 12, 2007). The *Diaz* court addressed the issue presented by CMS in the following discussion:

 "By arguing in favor of CMS, the defense wants something that is beyond the state of the art. The holy grail of some in the profession is to find some way to impose upon firearms identification a statistical model to present to juries. It would be an improvement if that could be done. But the fact that CMS—the closest the field has come to a probabilistic model—has not been accepted does not mean that the existing system is not reliable."

 *Id.* at *13, 2007 U.S. Dist. LEXIS 13152, at *7. The *Diaz* court held that the comparative microscopic matching method satisfied *Daubert,* and declined to require the use of the CMS method as a prerequisite to admissibility. *Id.*

"It is enough to state that CMS is not a new technique, nor in conflict with the traditional pattern matching that has been characterized as the discipline from the earliest of times. It is simply an extension...."

Moreover, the court noted the testimony during the hearing which suggested that the advent of CMS had not undermined the "generally accepted" nature of traditional comparative microscopy, stating as follows:

"[State expert witness Michael Nickol], himself a CMS proponent, disagreed with some of Schwartz's assessment that the field is in turmoil due to the development of CMS. Nickol[ ] explained that all firearm examiners start their process by looking for patterns that match under the comparison microscope.... [P]lus the field was not divided because CMS and traditional pattern matching were not mutually exclusive."

The trial court considered scientific literature as well as the testimony of the State's expert witnesses, and concluded that the comparative microscopic matching technique meets the *Frye–Reed* standard, stating as follows:

"The court finds here that the State has met its burden of proof of showing that the traditional pattern matching for determining forensic firearm analysis employed by the Maryland State Police is generally accepted in the relevant scientific community and is used almost exclusively in forensic laboratories in Maryland."

Were we to consider on the merits appellant's argument that traditional firearm toolmark pattern comparison no longer is accepted within the scientific community, we would conclude that the trial court did not err in admitting the expert testimony using the traditional comparative microscopy method.

*JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*