# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Robinson*, 2013 IL App (1st) 102476

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELLIOT ROBINSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2476 |
| Filed | December 2, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder was upheld on appeal, since, *inter alia*, the sixth amendment was not violated by the admission of the victim's dying declarations, expert testimony about toolmark and firearms identification was admissible without a *Frye* hearing, the admission of evidence of defendant's statement that he had sold bullets to the victim did not violate the prohibition against the admission of other-crimes evidence but, rather, was relevant to the extent that it supported defendant's claim that he had no dispute with the victim and it showed his consciousness of guilt, and defendant's argument that the trial court's failure to substantially comply with Supreme Court Rule 431(b) constituted plain error failed in the absence of any showing that the evidence was closely balanced. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-21382; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Melinda Grace Palacio, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
|  | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Rochford and Justice Hall concurred in the judgment and opinion. |

## OPINION

¶ 1        Following a jury trial in the circuit court of Cook County, defendant Elliot Robinson was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) and sentenced to 48 years in prison. On appeal, defendant contends: (1) the admission of the victim's statement made shortly before his death violated defendant's right to confront the witnesses against him; (2) the trial judge should have excluded the toolmark and firearms identification evidence as lacking a scientific basis or conducted a hearing on the admissibility of the evidence; (3) the trial court should have suppressed testimony regarding defendant's statement made in the lockup; (4) the trial court erred in admitting defendant's statement that he sold bullets to the victim; and (5) the jury venire was improperly questioned during *voir dire* in violation of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). For the following reasons, we reject defendant's arguments and affirm the judgment of the circuit court.

¶ 2                                     BACKGROUND

¶ 3        The record on appeal discloses the following facts. Defendant was indicted on six counts of first degree murder and four counts of aggravated unlawful use of a weapon for the October 12, 2005, shooting death of Centrale Collins (Collins). Prior to trial, defendant filed five motions *in limine* relevant to the issues raised in this appeal.

¶ 4                                    Pretrial Motions

¶ 5        Defendant filed a motion to exclude statements Collins provided to paramedic Leroy Phillips (Phillips) shortly before his death. Defendant argued these statements were inadmissible testimonial hearsay under *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The trial court denied the motion, ruling the statements were admissible as dying declarations and not testimonial.

¶ 6        Defendant also filed a motion seeking a hearing on the admissibility of the State's

proposed use of toolmark and firearms identification evidence pursuant to *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). The motion argued toolmark and firearms identification analysis has not been scientifically validated and lacks objective standards or a known error rate. The motion also asserted there is no general consensus that toolmark and firearms examiners can make an identification based on a few matching characteristics. The trial court, indicating there is no scientific process involved in firearms comparison which would be subject to *Frye*, denied the motion for a hearing.

¶ 7 Defendant subsequently moved to preclude the State's firearms examiners from testifying that their conclusions were within "a reasonable degree of scientific certainty." The trial court ruled the State's firearms examiners would be permitted to testify regarding their expertise in their respective fields, but would be barred from opining and testifying their conclusions were within "a reasonable degree of scientific certainty."

¶ 8 In addition, defendant filed a motion *in limine* to bar the State from introducing evidence that defendant was involved in the June 2, 2005, armed robbery of Arne Kent (Kent) and Geneva Benton (Benton) (the Kent robbery). The State sought to admit evidence of the Kent robbery because the firearms evidence indicated cartridge cases recovered by police at the scene of the Collins shooting and cartridges fired during the Kent robbery were fired from the same weapon. As one of the victims in the Kent robbery identified defendant as the perpetrator, the State argued the evidence of the Kent robbery was admissible as evidence of the shooter's identity in this case. The trial court denied defendant's motion to exclude the evidence from the Kent robbery.

¶ 9 Lastly, defendant moved to exclude any statements defendant made which were not recorded in accordance with state law. See 725 ILCS 5/103-2.1 (West 2008). The trial court heard this motion prior to the trial testimony of Chicago police detective Danny Stover. At the suppression hearing, Detective Stover testified defendant, while being taken to the lockup area to be processed, admitted he was at the scene of the shooting, but asserted he was not the shooter. The police previously recorded defendant denying any knowledge or information regarding the shooting. The trial court denied the motion to exclude the testimony as to defendant's statements, finding the statements in the lockup area were spontaneous and not the product of police interrogation.

¶ 10 Jury Selection

¶ 11 During *voir dire*, the trial court explained the following legal principles to the jury venire: defendant was presumed innocent; the State bore the burden of proving defendant guilty beyond a reasonable doubt; and defendant had the right to not present evidence and not testify. After discussing each principle, the trial court requested the potential jurors to raise their hands if they had a problem with the principle. No jurors raised their hands after these questions were posed. Defense counsel lodged no objection to this procedure.

¶ 12 Trial

¶ 13 Defendant's trial commenced on December 1, 2009. Neil Sennett, a paramedic for the City of Chicago fire department, testified that on October 12, 2005, he was dispatched to the

corner of 71st Street and Champlain Avenue at 3:57 p.m. Sennett observed Collins lying on his back in the rear garden of 7131 South Champlain Avenue and the first responders from fire engine 61 (the engine) were administering emergency care with oxygen, trauma dressings and saline IVs. Sennett spoke to Collins at the scene. According to Sennett, Collins was conscious and alert. Sennett requested Collins' name, date of birth and address, and Collins responded accordingly. Sennett further testified that after Collins was placed in the ambulance, he was given oxygen, another saline IV, and wound care because he was bleeding profusely. According to Sennett, Collins was not administered painkillers because the only painkiller on board was morphine, which would have dropped his blood pressure further.

¶ 14    Inside the ambulance, Collins inquired of Sennett whether he was going to die. Sennett testified he held Collins' hand and said, "[Y]es, young man, I'm sorry you are going to die." Immediately thereafter, Sennett heard his partner Phillips inquire whether Collins knew who shot him. Sennett heard Collins respond it was "Elliot." Phillips inquired where Elliot was from, to which Collins responded, "71st and Champlain." When Phillips inquired of Collins why he was shot, Sennett heard him reply Elliot accused Collins of stealing Elliot's weapon.

¶ 15    Sennett then drove the ambulance to Stroger Hospital at 4:13 p.m. According to Sennett, Collins was conscious when he opened the rear of the ambulance, but Collins died before he and Phillips transported Collins through the first set of hospital doors.

¶ 16    Phillips testified he was dispatched to 7131 South Champlain on October 12, 2005. Phillips confirmed the engine paramedic at the scene had administered Collins an IV with two bags of fluid, oxygen and bandages before Phillips arrived, but no medication. After speaking with the engine paramedic, Phillips spoke to Collins and inquired about his name, date of birth and other general questions. According to Phillips, Collins was awake and conscious when the questions were being posed to him.

¶ 17    After Collins was placed in the ambulance, Collins inquired of Sennett whether he was going to die; Sennett informed him he was. Phillips testified he then inquired of Collins who shot him and Collins responded "Elliot." Philips then inquired, "Elliot who?" and Collins replied, "Elliot from 71st and Champlain." Phillips also testified he asked Collins "Why did he shoot you?" and Collins said, "Over a stolen gun."

¶ 18    Phillips and Sennett then transported Collins to Stroger Hospital. Phillips further testified he completed a run sheet regarding the incident and noted Collins provided a statement while being prepared for transport.

¶ 19    Dr. Kendall Crowns, a Cook County deputy medical examiner, testified he performed the autopsy of Collins on October 13, 2005. Dr. Crowns observed five through-and-through gunshot wounds. Dr. Crowns also observed several abrasions on the body and a bruise to the right eye, which Crowns opined could have been caused from a fight or a fall. Dr. Crowns opined the cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 20    Detective Danny Stover testified he was assigned to investigate the Collins shooting and proceeded to 7131 South Champlain Avenue at 5:15 p.m. Detective Stover was informed by other detectives Collins had died, but had provided statements to the paramedics. Detective

-4-

Stover's partner, Timothy Murphy, searched a database of public records for an "Elliot" near 71st Street and Champlain Avenue, which yielded one result, for defendant at 7141 South Champlain Avenue. Detective Stover testified he proceeded to that address with other officers and spoke to defendant's mother. Detective Stover left the residence, but remained outside for a short while, at which point a vehicle carrying defendant arrived. Detective Stover identified defendant in court. Stover also testified he notified defendant his name was mentioned in an investigation. After defendant agreed to talk, Detective Stover and defendant proceeded to Area 2 police headquarters. According to Detective Stover, crime laboratory personnel performed a gunshot residue test on defendant before Detective Stover escorted him to Area 2 for an interview.[1]

¶ 21 Detective Stover further testified he and Detective Tom Shebish informed defendant of his constitutional rights. The police then spoke to defendant regarding the shooting, even "fishing" with lies to see how he would respond, for instance, to the assertion Collins had been shot 20 times. Detective Stover added the conversation with defendant was recorded on a videotape, a redacted version of which was shown to the jury, with instructions the jury was not to speculate regarding the contents of the redacted portions.

¶ 22 On the videotape, defendant acknowledged he knew Collins, but indicated the two were not close friends. Defendant stated he met with Collins on the Monday prior to the shooting, at which time Collins informed him "some guys were f***ing with him." According to defendant, Collins said he needed bullets and defendant replied he would attempt to obtain some bullets from his brother. Defendant further stated he obtained the bullets at Collins' request and sold them to Collins for $30. In addition, defendant stated that on the day of the shooting he attended a class at Chicago State University. Defendant learned of the shooting in a telephone call he received before leaving school at 3:45 p.m. Defendant proceeded from class to meet Tazie Williams (Williams). Defendant proceeded by bus and arrived at 4:40 p.m.

¶ 23 Continuing with his testimony, Detective Stover testified he confronted defendant with the statement Collins provided to the paramedics before he died and defendant denied any involvement. After defendant's statements were recorded on the videotape, he was transferred to the 5th District lockup to be photographed and fingerprinted. While waiting for lockup personnel to open the door, defendant informed Detective Stover and a Detective Shebish he wanted to talk. According to Detective Stover, defendant stated "this was bogus" and he was at the scene but did not shoot Collins.

¶ 24 In February 2006, Detective Stover learned the firearms evidence in the Kent robbery matched the firearms evidence in this case. Detective Stover met with Kent and Benton. On August 30, 2006, defendant was arrested for the murder of Collins.

¶ 25 Thomas Mander (Mander), a forensic investigator for the Chicago police department, testified that on October 12, 2005, he processed the crime scene at 7131 South Champlain Avenue, which was a boarded-up two-flat building. At the scene, Mander recovered five

---

[1]The record indicates the results of the gunshot residue testing were negative. Forensic scientist Ellen Connelly was unable to conclude whether defendant fired a weapon.

cartridge cases, identifying them all to be .40 caliber, but from three different manufacturers.[2]

¶ 26 Tiffany Kimble, a forensic scientist employed by the Illinois State Police, testified she examined five discharged cartridge cases from the Collins shooting and determined there were no suitable latent finger impressions on any of them.

¶ 27 Caryn Tucker (Tucker), a forensic scientist in the firearm and toolmark section of the Illinois State Police Forensic Science Center, testified she held a bachelor's degree in biology, with a minor in chemistry from Quincy University, as well as a master's degree in forensic science from the University of Illinois at Chicago. Tucker completed a two-year training program sponsored by the Illinois State Police, which included practical examinations of firearms and ammunition components. She also attended courses from the federal Bureau of Alcohol, Tobacco and Firearms (ATF) and firearms manufacturers regarding the operation and internal workings of firearms. Tucker also was trained to use the integrated ballistic identification system (IBIS), a computerized database which captures images of fired cartridge cases and bullets to compare evidence collected from various crime scenes. Tucker testified she has been qualified to testify as an expert in firearms identification on 27 occasions. Tucker had completed two proficiency tests in her field during the prior year.

¶ 28 Tucker explained firearms identification is a subdiscipline of forensic science concerned with determining whether a fired cartridge case or bullet was fired by a particular weapon. According to Tucker, the basis of firearms identification is in the reproduction and similarity of what examiners refer to as class characteristics and individual characteristics. Class characteristics are features determined prior to manufacture, such as caliber, the breach face pattern[3], the firing pin impression shape, the number of lands[4] and grooves and direction of twist. Individual characteristics are imperfections and irregularities caused during manufacture or resulting from use, abuse, coercion or rust. Tucker testified firearms examiners use a comparison microscope, which is essentially two microscopes joined by an optical bridge, to compare the class and individual characteristics of two pieces of evidence.

¶ 29 On cross-examination of her qualifications, Tucker testified her comparisons are a subjective determination, but they are based on objective scientific principles and verified by a second examiner. Tucker also testified she applied the definitions and guidelines promulgated by the Association of Firearm and Tool Mark Examiners (AFTE). Tucker agreed the AFTE guidelines are not mandatory, but added she must follow them to reach conclusions to a level of certainty with which she is comfortable. Tucker acknowledged it would be impossible for her to state with absolute certainty that two firearms could not

---

[2]Mander also recovered a black, hooded sweatshirt and blood samples from the pools of blood on the ground. A forensic scientist employed by the Illinois State Police from 2005 to 2008 testified defendant's DNA was excluded from a mixture taken from a portion of the sweatshirt.

[3]Tucker testified that when a bullet is fired, the cartridge case will move rearward into an area known as the breach face.

[4]"Lands" are the ridges between grooves.

produce identical markings on a fired cartridge case. Tucker further testified the increased automation in firearms manufacture since 1929 creates potential carryover in subclass characteristics, *e.g.*, when something on a manufacturing tool carries over from one weapon to the next, but the weapons would not have similar individual characteristics. Moreover, Tucker testified the AFTE theory of identification, which is followed by most firearms examiners in the country, was the subject of a validation study.

¶ 30    After the trial court found Tucker qualified to testify as an expert, Tucker testified she received the fired cartridge cases from this shooting in December 2005. Tucker's microscopic examination of the cartridge cases led her to conclude they were all discharged from the same weapon, a conclusion verified by a second examiner in her laboratory. Tucker then placed one of the cartridge cases into the IBIS, which generated possible links to other incidents. Tucker called for the delivery of evidence from two other incidents for comparison, but concluded the cartridge cases in this case could not be identified or excluded as having been fired from the firearms in the other incidents.

¶ 31    Peter Brennan (Brennan), a group supervisor in the firearm and toolmark section of the Illinois State Police Forensic Science Center, testified he has a bachelor's degree from North Central College and completed the two-year training program sponsored by the Illinois State Police. Brennan also attended various workshops held by the FBI, ATF, and firearms manufacturers. Brennan had been qualified to testify as an expert in firearms and toolmark identification on 26 separate occasions in state court and once in federal court. Brennan participates in annual proficiency tests and has conducted thousands of firearms comparisons.

¶ 32    After the trial court found Brennan qualified as an expert witness, Brennan testified he was assigned to examine evidence related to the Kent robbery. Brennan took custody of the cartridge cases from the Kent robbery on January 24, 2006. Brennan took the cartridge case which seemed most representative of the Kent robbery and submitted it to an automated database known as IVAS,[5] which returned a list of potential candidates for comparison. After viewing the images from these candidates, Brennan called for the cartridge cases recovered from the Collins shooting. Brennan performed a comparison and concluded the cartridge cases in the Kent robbery were fired by the same weapon as the cartridge cases fired in the Collins shooting. According to Brennan, his conclusion was verified by a second examiner. On cross-examination, Brennan testified that to his knowledge, there has never been a difference of opinion between two examiners in his office which warranted outside review, although there was a procedure in the event of such disagreement.

¶ 33    Kent testified that on the evening of June 1, 2005, or the early morning of June 2, 2005, he and Benton were robbed at gunpoint in the alley behind Benton's house at 36 East 101st Street. Kent also testified a man with a gun knocked on the window of his vehicle and instructed him to get out. Kent further testified he was standing at the left front fender of his automobile when the man instructed him to hand over all of his money and to take off his clothes. According to Kent, the man wore a ski mask covering only his nose, cheeks and mouth so Kent could only observe the top portion of his face, his head and hair. Kent

---

[5]Brennan did not explain this acronym in his testimony.

-7-

testified, however, the man was two feet away from him when he pulled down his mask and said "I'm that N*** Raamon, I don't give a f***. I want everything you got because if you try to run I'm going to kill you're a***."

¶ 34    Kent additionally testified the man instructed him to go into the garage and lay on the floor, where Barton was located. After Kent went into the garage, the man instructed him to go to the fence on the other side of the alley and stated if Kent ran, he was going to kill him. Kent testified he then ran toward Michigan Avenue and heard gunshots.

¶ 35    Kent reported the crime to the police. According to Kent, on February 10, 2006, Detective Stover and another detective came to his residence to present him with some photographs to examine. At the time, Kent provided a tentative identification of defendant. On August 21, 2006, Kent went to the Area 2 police headquarters and viewed a lineup where he identified defendant as the offender who robbed him at gunpoint. Kent also identified defendant in court.

¶ 36    Benton testified for the defense regarding the Kent robbery. Contrary to Kent's testimony, Benton testified she never observed the man remove his mask. Benton was unable to identify the perpetrator of the Kent robbery and did not recognize defendant in court.

¶ 37    Joan Agnew (Agnew), an attorney at the firm of James M. Scanlon and Associates–who was the general counsel for the Chicago Board of Election Commissioners–testified that certified voting registration records are required by law to be kept in the normal course of business. Agnew is able to determine voter registrations for a static year and did so for 2004 and 2006. According to Agnew, the corner of 71st Street and Champlain Avenue touches three different precincts, so she reviewed registration records for the entire ward. Agnew testified that other residents of the ward registered to vote have "Elliott" in part of their name: (1) Vern Lee Elliot at 7221 South Lawrence Avenue, born in 1937; (2) Elliot Johnson at 7240 South Champlain Avenue, born in 1912; and (3) Elliot D. Cameron, Sr., at 7046 South Eberhardt Avenue, born in 1972.

¶ 38    Williams testified she met defendant through her godsister and knows him as "L." Williams testified she lived at 71st Street and Damen Avenue and saw defendant on October 12, 2005. According to Williams, defendant telephoned before he came over. Defendant arrived at approximately 4 or 4:20 p.m. Williams testified she and defendant watched television. Williams also gave defendant a Band-Aid for a cut on his hand because she thought it "looked nasty" since it was still open but not bleeding. Approximately 2½ or 3 hours later, defendant received a telephone call from his mother and then he departed.

¶ 39    Patrick Steppe (Steppe) also testified for the defense. Steppe was visiting his old neighborhood and walking down 72nd Street toward Champlain Avenue when he heard gunshots and observed three individuals he did not recognize running out of the gangway. Steppe testified he proceeded down the gangway and into a backyard where he found Collins on the ground, shot and beaten. Steppe telephoned 911 and later spoke to the detectives at the scene, but was never contacted by the police thereafter.

¶ 40    Darrin Crowder, a Chicago police detective, testified he lived at 7108 South Chaplain Avenue. Detective Crowder is active in his community and frequently had neighborhood kids over to play with his sons. Detective Crowder testified he had known defendant for over 10

years and called him "L." On October 12, 2005, Crowder was in his backyard and heard multiple gunshots coming east from his residence, then observed four teenagers run down the alley. Detective Crowder recognized one of the teenagers to be Evan Odoms (Odoms). Later that day, Detective Crowder escorted Odoms to the Area 2 detective division and Odoms provided a statement, but was never contacted again.

¶ 41      Odoms testified he lived at 7128 South Champlain Avenue. Odoms has been friends with defendant since he was seven years old and knows him as "L." Odoms also knew Detective Crowder, but not Steppe. Odoms further testified he has been friends with Collins for about a year and a half and introduced him to defendant.

¶ 42      Odoms testified he and three friends were sitting on his porch at 3:45 p.m. on October 12, 2005, when he observed Collins walking across the street with five or six men, but Collins did not acknowledge Odoms. Odoms also testified he went across the street to talk to Collins but he turned and walked down a gangway with the men behind him. Odoms further testified he only recognized one other person, "Big Mike," whom he met through Collins but did not know personally.

¶ 43      According to Odoms, he followed Collins and the others down the gangway toward the backyard, but stopped before reaching the backyard, because he observed Collins being physically attacked and Big Mike holding a handgun. Odoms testified he turned and ran. After hearing gunshots, Odoms ran through the gangway by his house, into the alley where he noticed Detective Crowder, and then continued down a few houses to a friend's house.

¶ 44      Hours later, Odoms returned to his block and conversed with Detective Crowder. Odoms and Detective Crowder then went to the police station on 111th Street and Ellis Avenue, where Odoms spoke with Detectives Stover and Murphy. Odoms testified he provided a statement regarding what he observed and what happened, while the detectives took notes. According to Odoms, he was able to observe most of the yard and all the men for a couple seconds but the detectives and Gillespie wanted him to say he could only see a portion of the yard. Odoms testified he did not see defendant in the backyard.

¶ 45      Approximately a year later, Odoms met with the same detectives and Assistant State's Attorney (ASA) Alexandria Gillespie (Gillespie) to provide another statement. Odoms testified ASA Gillespie transcribed Odoms' statement, presented it to him for his review, and allowed him to make changes before he signed it. Odoms did not recall Gillespie taking a photograph of him and him signing it, but he identified himself in a picture and his signature upon the photo. Odoms additionally testified he was really scared of the detectives because they were intimidating.

¶ 46      According to Odoms, he informed detectives about Big Mike at both meetings, but Odoms acknowledged the statement memorialized by Gillespie did not refer to Big Mike. Odoms was unable to identify Big Mike in the array of photographs the detectives provided. Odoms testified that after the second meeting with the detectives, he was never contacted.

¶ 47      Detective Stover testified in rebuttal that he interviewed Odoms. According to Detective Stover, Odoms never wrote anything down and handed it to him, nor did Detective Stover pressure Odoms to say anything. Detective Stover also testified Odoms informed him during the initial interview that he had suspected Collins burglarized his house and was going to

confront him with this information. Detective Stover further testified Odoms informed him he observed a "Big Mike" or "Fat Mike" holding a black handgun. Detective Stover conducted a search for all "Mikes" in the area on the Chicago police department database and submitted the photos based on Odoms' information, but Odoms did not identify any photo as that of the shooter. After Detective Stover confronted Odoms with defendant's statement of being at the scene, Odoms "put his head down and said, well, I don't know, I didn't see him there."

¶ 48    ASA Gillespie testified she interviewed Odoms on August 28, 2006, and memorialized his statement regarding the Collins shooting. Before ASA Gillespie took his statement, she was alone with Odoms and inquired whether he had any complaints about the way he was treated by the police. According to ASA Gillespie, Odoms replied he had been treated well. After she memorialized his statement, ASA Gillespie allowed Odoms to review and correct the statement, had him initial each of the four pages and sign the statement. ASA Gillespie testified she then took a photograph of Odoms, marked the date and time thereon and had it signed by herself, a detective and Odoms. ASA Gillespie further testified Odoms never said he observed a man named Big Mike with a handgun or fire a weapon.

¶ 49    Following closing arguments and the jury instructions, the jury deliberated and found defendant guilty of first degree murder. The jury also found the State proved defendant personally discharged a firearm that proximately caused Collins' death. On January 4, 2010, defendant filed a posttrial motion for a new trial. On July 13, 2010, following a hearing, the trial court denied defendant's posttrial motion and proceeded to a sentencing hearing. After hearing evidence in aggravation and mitigation of the offense, the trial judge sentenced defendant to 48 years in the Illinois Department of Corrections. On August 3, 2010, defendant filed a motion to reconsider his sentence, which the trial judge denied the same day. Defendant also filed a timely notice of appeal on August 3, 2010.

¶ 50                                          DISCUSSION

¶ 51    On appeal, defendant argues: (1) the admission of the victim's statement made prior to his death violated defendant's right to confront the witnesses against him; (2) the trial judge should have excluded the toolmark and firearms identification evidence as lacking a scientific basis; (3) the trial court should have suppressed testimony regarding defendant's statement made in the lockup; (4) the trial court erred in admitting defendant's statement that he sold bullets to the victim; and (5) the jury venire was improperly questioned during *voir dire* in violation of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). We address defendant's arguments in turn.

¶ 52                        The Admission of the Victim's Statements

¶ 53    Defendant first argues the trial court's decision to allow paramedics Sennett and Phillips to testify regarding Collins' statements that "Elliot" shot him and Elliot was from "71st and Champlain" and shot him over a stolen gun violated defendant's constitutional right to confront the witnesses against him. See *Crawford*, 541 U.S. at 68. Our supreme court has directed that, when reviewing the admissibility of out-of-court statements into evidence, we

must first determine whether those statements " 'pass[ ] muster as an evidentiary matter.' " *People v. Melchor*, 226 Ill. 2d 24, 34 (2007) (quoting *In re E.H.*, 224 Ill. 2d 172, 179 (2006)). Only where the statements are admissible as an evidentiary matter may this court consider " 'constitutional objections–including *Crawford*-based confrontation clause claims.' " *Melchor*, 226 Ill. 2d at 34 (quoting *In re E.H.*, 224 Ill. 2d at 179-80). This approach is consistent with the general rule of avoiding constitutional questions where the case can be decided on nonconstitutional grounds. *Melchor*, 226 Ill. 2d at 34. Accordingly, we first consider whether Sennett's testimony regarding Collins' statement was admissible as an evidentiary matter.

¶ 54    In this case, the trial court admitted the testimony as to Collins' statements as dying declarations. "A dying declaration qualifies as a hearsay exception because it is considered trustworthy where the likelihood of fabrication is minimal due to the declarant's belief that death is imminent." *People v. Graham*, 392 Ill. App. 3d 1001, 1006 (2009). A statement may be admitted as a dying declaration when it is shown beyond a reasonable doubt, based upon an examination of the totality of the facts and circumstances surrounding the declaration, that: "(1) the declaration pertains to the cause or circumstance of the homicide; (2) the declarant must believe that death is imminent; and (3) the declarant must possess mental faculties sufficient to give an accurate statement about the circumstances of the homicide." *People v. Georgakapoulos*, 303 Ill. App. 3d 1001, 1009 (1999). A trial court's decision to admit a statement pursuant to the dying declaration exception to the hearsay rule is afforded some deference and a reviewing court will not overturn that decision unless it is against the manifest weight of the evidence. *People v. Hatchett*, 397 Ill. App. 3d 495, 502 (2009). A trial court's finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *People v. Stiff*, 391 Ill. App. 3d 494, 499 (2009).

¶ 55    In this case, after Sennett informed Collins he was going to die, Collins identified "Elliot" from "71st and Champlain" as the shooter and stated Elliot accused him of stealing a gun. Sennett and Phillips testified Collins was alert, able to respond to questions, and was not administered painkillers. Defendant does not dispute the statements were dying declarations. Given this record, we conclude the trial court's ruling the statements were admissible as dying declarations was not against the manifest weight of the evidence. Thus, we turn to consider whether the admission of the dying declarations violated defendant's constitutional right to confront the witnesses against him.

¶ 56    The confrontation clause of the sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. This part of the sixth amendment applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007). The issue of whether defendant's sixth amendment confrontation rights were violated involves a question of law, which we review *de novo*. *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009).

¶ 57    In *Crawford*, the United States Supreme Court held that out-of-court statements that are testimonial in nature are barred by the confrontation clause, regardless of whether the trial court finds the statements to be reliable, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. The *Crawford*

Court, however, indicated that dying declarations may be an historical exception to the rule against admission of hearsay testimony:

> "The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citations.] Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations.] We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*." *Id*. at 56 n.6.

The United States Supreme Court recognized this long-standing exception to the exclusion of testimonial dying declaration statements again in *Giles v. California*, 554 U.S. 353, 358 (2008) ("We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. [Citation.] The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. [Citation.]"). The United States Supreme Court, however, has not decided the issue.

¶ 58    This court has held the admission of dying declarations that are testimonial in nature does not violate the confrontation clause. *People v. Graham*, 392 Ill. App. 3d 1001, 1008 (2009); *People v. Gilmore*, 356 Ill. App. 3d 1023, 1033 (2005). This court relied not only on the *dicta* from *Crawford* and *Giles*, but also the California Supreme Court's decision in *People v. Monterroso*, 101 P.3d 956 (Cal. 2004). The *Monterroso* court reasoned:

> "[I]f, as *Crawford* teaches, the confrontation clause 'is most naturally read as reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' [citation], it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." *Monterroso*, 101 P.3d at 972 (quoting *Crawford*, 541 U.S. at 54).

Defendant suggests *Graham* and *Gilmore* are incompatible with the confrontation clause, but the rationale this court has adopted from *Monterroso* explains why defendant's argument fails. Accordingly, in adherence to this court's precedent, we conclude the dying declarations were admissible in this case and the admission of those statements did not violate the sixth amendment, even if those statements were testimonial.

¶ 59            Admission of Toolmark and Firearms Identification Evidence

¶ 60    Defendant next argues the trial court erred when it denied his motion *in limine* to exclude expert testimony from firearms examiners that the cartridge cases found at the scene of Collins' shooting were fired from the same gun used in the Kent robbery. Defendant contends toolmark and firearms identification analysis is not generally accepted in the relevant scientific community and thus the expert testimony should have been excluded under *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Alternatively, defendant argues that the court should have conducted a *Frye* hearing to determine whether microscopic firearms comparison is a generally accepted technique within the relevant scientific community.

¶ 61    The admission of scientific testimony in Illinois is governed by the *Frye* "general

-12-

acceptance" test. See *People v. Caballes*, 221 Ill. 2d 282, 334 n.1 (2006). Under *Frye*, "scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004) (quoting *Frye*, 293 F. at 1014). The *Frye* standard is limited to scientific methodology that is considered "new" or "novel." *People v. McKown*, 226 Ill. 2d 245, 257 (2007) (*McKown I*). General acceptance of a methodology "does not require that the methodology *** be accepted by unanimity, consensus, or even a majority of experts." *Simons*, 213 Ill. 2d at 530; *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002), *abrogated on other grounds by Simons*, 213 Ill. 2d at 530. Under *Frye*, a court inquires as to the general acceptance of a methodology, not the particular conclusion reached by an examiner or the application of the methodology in a particular case. *McKown I*, 226 Ill. 2d at 255; *Donaldson*, 199 Ill. 2d at 77.

¶ 62    Our standard of review is *de novo*. *Simons*, 213 Ill. 2d at 530-31. "Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning." *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 34. "*De novo* review is completely independent of the trial court's decision." *Id.* "In conducting such *de novo* review, the reviewing court may consider not only the trial court record but also, where appropriate, sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions." *Simons*, 213 Ill. 2d at 531.

¶ 63                        Is Firearms Identification Analysis Scientific?

¶ 64    As a threshold matter, we observe that *Frye* applies only to scientific evidence. *McKown I*, 226 Ill. 2d at 254. In this case, the trial judge denied defendant's motion for a *Frye* hearing, ruling a hearing was unnecessary because the firearms comparison is performed visually and the methodology was not a scientific process. Defendant on appeal argues the hearing was required.

¶ 65    In *McKown I*, a case we consider in further detail below, our supreme court considered whether horizontal gaze nystagmus (HGN) testing was properly admitted without a *Frye* hearing. *Id.* at 247. "The HGN test purportedly measures nystagmus, which has been defined as an abnormal and involuntary rapid movement of the eyeballs up and down, or more commonly, side to side." *Id.* at 248. "Because alcohol consumption can cause nystagmus, police officers have been trained to check a person's eye movements when attempting to determine if a driver has been driving while impaired by alcohol." *Id.* at 249.

¶ 66    The *McKown I* court addressed the question of whether HGN testing is scientific as a threshold issue. *Id.* at 254. The court observed that some jurisdictions have held that HGN testing is not scientific, but the majority of jurisdictions addressing the issue have held HGN testing to be scientific because it is based on a scientific principle which is not common knowledge, *i.e.*, consumption of alcohol causes the type of nystagmus measured by the HGN test. See *id.* at 255 (and cases cited therein). The *McKown I* court agreed with the majority view, ruling HGN testing is scientific because the results of an HGN test are meaningless to the average person without expert interpretation. *Id.* at 256-57.

¶ 67    In this case, neither defendant nor the State has suggested toolmark and firearms identification materials are understandable to the layperson absent expert testimony. Furthermore, as our analysis of this issue will demonstrate, numerous courts–including those skeptical of the methodology–have analyzed the subject as one involving scientific or technical evidence. Accordingly, we shall do the same in this case.[6]

¶ 68                                             Novelty

¶ 69    We next consider the question of novelty. A determination under "the *Frye* test is necessary only if the scientific principle, technique or test offered by the expert to support his or her conclusion is 'new' or 'novel.' " *People v. McKown*, 236 Ill. 2d 278, 282-83 (2010) (*McKown II*); see *McKown I*, 226 Ill. 2d at 257; *Donaldson*, 199 Ill. 2d at 78-79. While recognizing that "a 'new' or 'novel' scientific technique is not always easy to identify, especially in light of constant scientific advances in our modern era," our supreme court has instructed that generally a "scientific technique is 'new' or 'novel' if it is 'original or striking' or does 'not resembl[e] something formerly known or used.' " *Donaldson*, 199 Ill. 2d at 79 (quoting Webster's Third New International Dictionary 1546 (1993)).

¶ 70    The State contends we may end our inquiry here because similar expert firearms testimony has been generally admissible in Illinois courts since *People v. Fisher*, 340 Ill. 216, 240-41 (1930). Indeed, the State maintains the trial court and this court are both bound by *Fisher* as controlling authority. Defendant, relying upon *McKown I*, argues that latent print identification should be deemed "novel" because this type of microscopic firearms comparison has long been used by firearms examiners, but the methodology, like HGN testing, has been subject to recent court challenges and has not been subject to a *Frye* hearing in Illinois. See *McKown I*, 226 Ill. 2d at 258.

¶ 71    Neither *Fisher* nor *McKown I* provides a definitive answer to the question of novelty in this case. *Fisher* addressed the admissibility of this type of firearms examination, but did not purport to apply *Frye* or determine whether the methodology was generally accepted. See *Fisher*, 340 Ill. at 237-41. The *McKown I* court did not precisely indicate whether it found HGN testing was novel because there was a history of legal challenges or because the courts addressing those challenges had reached different conclusions regarding the general acceptance of HGN testing. See *McKown I*, 226 Ill. 2d at 257. In any event, we will assume for the sake of argument the ballistic comparison may be "novel," and consider the application of *Frye* and its progeny to the admission of ballistics evidence in Illinois. See *McKown I*, 226 Ill. 2d at 254.

---

[6]As this court may affirm the trial court's rulings on the admission of evidence for any reason found in the record (*Donaldson v. Central Illinois Public Service Co.*, 313 Ill. App. 3d 1061, 1075 (2000)) and our standard of review is *de novo* (*Simons*, 213 Ill. 2d at 530-31), the trial judge's ruling on this point is not reversible error for the reasons set forth in this opinion.

-14-

¶ 73        "A court may determine the general acceptance of a scientific principle or methodology in either of two ways: (1) based on the results of a *Frye* hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *McKown I*, 226 Ill. 2d at 254. In this case, the trial court denied defendant's motion for a *Frye* hearing. Accordingly, we will consider whether an Illinois court may take judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject without conducting a *Frye* hearing.

¶ 74        Initially, we review in some detail two recent opinions from our supreme court regarding judicial notice of general acceptance: *Simons*, which ruled judicial notice of general acceptance was proper, and *McKown I*, which ruled a *Frye* hearing was required.

¶ 75        In *Simons*, our supreme court considered whether the trial court properly took judicial notice of the general acceptance of actuarial risk assessment to assess sexually violent offenders for a risk of recidivism. *Simons*, 213 Ill. 2d at 533. The *Simons* court, noting this court was "sharply divided" on the question (*id.*), explained that "experts in at least 19 other states rely upon actuarial risk assessment in forming their opinions on sex offenders' risk of recidivism" (*id.* at 535-36). Our supreme court concluded that "general acceptance of actuarial risk assessment has been thoroughly litigated in several states." *Id.* at 537. Moreover, the *Simons* court was "unable to identify any state outside of Illinois in which expert testimony based upon actuarial risk assessment was deemed inadmissible on the question of sex offender recidivism." *Id.* at 539. The court further observed that several jurisdictions mandated actuarial risk assessment by statute or regulation and "note[d] that the academic literature contains many articles confirming the general acceptance of actuarial risk assessment by professionals who assess sexually violent offenders for risk of recidivism." *Id.* at 541. Ultimately, the *Simons* court concluded that "[t]aking all of this together–the case law, the statutory law, and the academic literature," it was "more than convinced that actuarial risk assessment has gained general acceptance in the psychological and psychiatric communities." *Id.* at 543.

¶ 76        In contrast, in *McKown I*, as previously noted, the issue on appeal was whether the trial court properly admitted the results of HGN testing without first holding a *Frye* hearing. *McKown I*, 226 Ill. 2d at 247-48. Regarding the issue of general acceptance, the *McKown I* court discussed divergent decisions of the Illinois Appellate Court. See *id.* at 263-65. The court also surveyed appellate court decisions from foreign jurisdictions and found that they were "as varied as the states that have made them" regarding the general acceptance of HGN testing. *Id.* at 272. The court concluded that these decisions did "not present the kind of unequivocal or undisputed viewpoint on the issue upon which a court can take judicial notice." *Id.*

¶ 77        Regarding the State's argument that the court could take judicial notice of the general acceptance of HGN testing "based on the technical writings on the subject," the court determined it could "consider not only the record, but also 'sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions.' " *Id.* (quoting *Simons*, 213 Ill. 2d at 531). The court observed "HGN testing appears to have

as many critics as it does champions." *Id.* at 275. Without an "unequivocal or undisputed viewpoint" from the scientific literature, the court decided it could not "take judicial notice of the general acceptance of the HGN test as a reliable indicator of alcohol impairment based on these technical writings." *Id.*

¶ 78    *Simons* and *McKown I* thus instruct a court should examine the unanimity or division of Illinois courts on the admissibility of a type of scientific evidence, then examine the unanimity or division of other jurisdictions on the question, with an emphasis on whether the issue has been thoroughly litigated. The court may also consider the unanimity or division of opinion in the scientific and technical literature on the subject. With these principles in mind, we turn to consider the admissibility of toolmark and firearms identification evidence.

¶ 79                    General Acceptance of Toolmark and Firearms Identification

¶ 80    As previously noted, expert firearms testimony has been generally admissible in Illinois courts for decades. *Fisher*, 340 Ill. at 240-41. Defendant does not identify any Illinois case law casting doubt on the general admissibility of such testimony. Unlike *McKown I*, there is no split of authority in Illinois on this issue.

¶ 81    Defendant relies upon three federal district court decisions addressing challenges to toolmark and firearms identification methodology: *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005); *United States v. Montiero*, 407 F. Supp. 2d 351, 365-72 (D. Mass. 2006); and *United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008). None of these cases ultimately support excluding microscopic firearms comparison evidence on the basis of *Frye*.

¶ 82    In *Green*, the firearms expert repeatedly conceded that he relied on his subjective judgment and "[t]here were no reference materials of any specificity, no national or even local database on which he relied." *Id.* at 107. The trial judge questioned the reliability of the expert's methodology. *Id.* at 119-20.[7] Indeed, the judge opined: "The more courts admit this type of toolmark evidence without requiring documentation, proficiency testing, or evidence of reliability, the more sloppy practices will endure; we should require more." *Id.* at 109. Yet the judge in *Green* allowed the firearms testimony, based primarily on the unanimous judicial acceptance of such testimony, but limited the expert to describing the similarities in the shell casings he observed and barred the expert from opining the casings come from a specific pistol "to the exclusion of every other firearm in the world." (Internal quotation marks omitted.) *Id.* at 124.

¶ 83    Similarly, in *Montiero*, the judge found the underlying principles behind firearm identification may be scientifically valid, but "there is no reliable *** scientific methodology which will currently permit the expert to testify that [a casing and a particular firearm are] a 'match' to an absolute certainty, or to an arbitrary degree of statistical certainty." *Montiero*, 407 F. Supp. 2d at 372. The *Montiero* judge found the witness qualified, but his testimony

_____

[7]In contrast, pursuant to *Frye*, Illinois courts are not concerned with the application of the methodology in a particular case. *McKown I*, 226 Ill. 2d at 255; *Donaldson*, 199 Ill. 2d at 77.

was not adequately documented or subject to peer review. *Id.* at 374. The judge allowed Montiero's motion to exclude ballistics without prejudice. *Id.* at 375. In general, the *Montiero* judge found the methodology of firearms identification is sufficiently reliable (*id.* at 372) and would allow a qualified examiner who has documented and had a second qualified examiner verify her results to testify based on those results that a cartridge case matches a particular firearm to a reasonable degree of ballistic certainty (*id.* at 375). The judge would bar testimony "that there is a match to an exact statistical certainty." *Id.*

¶ 84       Likewise, in *Glynn*, the district court judge was concerned with the degree of subjectivity involved in firearms identification. *Glynn*, 578 F. Supp. 2d at 572. The *Glynn* judge explained that while other forms of expert testimony, including medical expert testimony, may involve subjective judgments, "ballistics comparison lacks defining standards to a degree that exceeds most other kinds of forensic expertise." *Id.* at 574. Thus, the judge concluded "ballistics examination not only lacks the rigor of science but suffers from greater uncertainty than many other kinds of forensic evidence." *Id.* Nevertheless, the judge concluded the "methodology has garnered sufficient empirical support as to warrant its admissibility." *Id.* Accordingly, the judge ruled the ballistics evidence was admissible, although the expert would be limited to testifying matches were "more likely than not." See *id.* at 574-75.

¶ 85       There are a number of other reported federal district court decisions involving similar challenges. See, *e.g.*, *United States v. Otero*, 849 F. Supp. 2d 425 (D.N.J. 2012); *United States v. Willock*, 696 F. Supp. 2d 536 (D. Md. 2010); *United States v. Taylor*, 663 F. Supp. 2d 1170 (D.N.M. 2009). A number of these courts engaged in lengthy and detailed hearings, involving multiple witness and the presentation of documentary evidence. *Otero*, 849 F. Supp. 2d at 429 (three-day hearing at which the parties "submitted various documents"); *Taylor*, 663 F. Supp. 2d at 1171 (two-day hearing); *Montiero*, 407 F. Supp. 2d at 355 (six-day evidentiary hearing and "extensive documentary record replete with photographs, demonstratives, and journal articles"). In none of these judicial decisions–including those specifically cited by defendant in this appeal–did a court rule traditional microscopic firearms comparison testimony was generally inadmissible.

¶ 86       Of course, in federal courts, admission of expert testimony is governed by the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), whereas Illinois adheres to the *Frye* test. Yet in *Daubert*, the United States Supreme Court affirmed the continued relevance of whether the technique at issue is generally accepted within the scientific community. *Id.* at 594. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community' [citation] may properly be viewed with skepticism." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985)).

¶ 87       Thus, some of the aforementioned federal courts have specifically mentioned or discussed the issue of general acceptance in ruling on recent challenges to toolmark and firearms identification analysis. For example, in *Otero*, the court observed the AFTE theory of firearms and toolmark identification is widely accepted in the forensic community and specifically in the community of firearm and toolmark examiners. *Otero*, 849 F. Supp. 2d at 435. The *Willock* court similarly found the AFTE theory of firearms-related toolmark

identification has been "generally accepted within the field of toolmark examiners." *Willock*, 696 F. Supp. 2d at 571. In *Taylor*, the court found the use of pattern matching underlying the AFTE theory "is generally accepted among firearms examiners in the field."[8] *Taylor*, 663 F. Supp. 2d at 1178. The *Montiero* court found it "clear that the community of firearm and toolmark examiners accepts the current identification methodology as reliable" and "the community of toolmark examiners seems virtually united in their acceptance of the current technique." *Montiero*, 407 F. Supp. 2d at 372.

¶ 88    Neither the defendant nor the State addresses the case law from other states adhering to the *Frye* test, but our review of such cases reveals the results are the same as those in the federal courts. For example, in *Fleming v. State*, 1 A.3d 572 (Md. Ct. Spec. App. 2010), the trial court held a three-day *Frye* hearing on firearms toolmark identification and concluded the traditional comparative microscope matching technique was admissible. *Id.* at 575.[9] On appeal, the *Fleming* court ruled that even if the admission of the evidence was not harmless error, the appellate court would hold the trial court did not err in admitting such evidence. *Id.* at 585. The court concluded, notwithstanding the current debate over the issue, courts have consistently found the traditional method of firearms toolmark analysis to be generally accepted within the scientific community and reliable. *Id.* at 590.

¶ 89    Similarly, in *Commonwealth v. Whitacre*, 2005 PA Super 221, the Superior Court of Pennsylvania affirmed the trial judge's decision to admit comparison microscope analysis (albeit following a more cursory hearing than in *Fleming*), ruling the methodology was generally accepted within the scientific community consisting of firearms experts and a number of significant governmental bodies within and without Pennsylvania. *Id.* ¶ 14. In *Jones v. United States*, 27 A.3d 1130 (D.C. 2011), the District of Columbia Court of Appeals affirmed the trial judge's decision to not conduct a *Frye* hearing regarding firearms pattern matching, concluding none of the evidence proffered suggested the methodology was no longer generally accepted. *Id.* at 1138. In *People v. Givens*, 912 N.Y.S.2d 855 (N.Y. Sup. Ct. 2010), the trial judge, after reviewing the case law, scholarly reports and articles, denied the defense request to exclude firearms and toolmark identification or conduct a *Frye* hearing, based primarily on the unanimous judicial acceptance of such testimony. *Id.* at 857.

¶ 90    Defendant also relies upon the criticism of the methodology found in scholarly reports and articles. National Research Council, Committee on Identifying the Needs of the Forensic Sciences Community *et al.*, *Strengthening Forensic Science in the United States: A Path Forward* (2009), *available at* http://www.nap.edu/catalog.php?record_id=12589 (hereinafter, NRC Report); Richard Grzybowski *et al.*, *Firearm/Toolmark Identification: Passing the Reliability Test Under Federal and State Evidentiary Standards*, 35 AFTE J. 209, 213 (2003). Federal and state courts considering these materials nevertheless have found

---

[8] The trial court also found a newer method of pattern matching, involving consecutively matching striae, was generally accepted among firearms examiners *Taylor*, 663 F. Supp. 2d at 1178.

[9] The trial court, however, excluded testimony based on the consecutively matching striae technique, finding it was not generally accepted. *Fleming*, 1 A.3d at 575-76. The consecutively matching striae technique is not at issue in this appeal.

microscopic firearms comparison methodology to be generally accepted and declined to exclude the type of testimony at issue in this case. See, *e.g.*, *Otero*, 849 F. Supp. 2d at 427, 430, 438 (citing NRC Report, *supra* at 150, and Grzybowski *et al.*, *supra* at 211); *Willock*, 696 F. Supp. 2d at 555, 571 (NRC Report); *Taylor*, 663 F. Supp. 2d at 1177-78,1180 (NRC Report); *Monteiro*, 407 F. Supp. 2d at 362-63, 367, 372 (Grzybowski *et al.*, *supra* at 213); *Jones*, 27 A.3d at 1137 n.7 (NRC Report); *Fleming*, 1 A.3d at 104, 106 (NRC Report). In *Glynn*, the judge relied in part on a different NRC report to conclude the "methodology has garnered sufficient empirical support as to warrant its admissibility." *Glynn*, 578 F. Supp. 2d at 574 (citing Daniel L. Cork *et al.*, Ballistic Imaging 30-46 (2008)). Although the scholarly materials cited by defendant and the defendants in other cases may raise substantial criticisms of the methodology at issue in this case, no court has found these critiques sufficient to conclude the methodology is no longer generally accepted.

¶ 91　　In short, in recent years, federal and state courts have had occasion to revisit the admission of expert testimony based on toolmark and firearms identification methodology. Such testimony has been the subject of lengthy and detailed hearings, and measured against the standards of both *Frye* and *Daubert*. Courts have considered scholarly criticism of the methodology, and occasionally placed limitations on the opinions experts may offer based on the methodology. Yet the judicial decisions uniformly conclude toolmark and firearms identification is generally accepted and admissible at trial. Accordingly, we conclude the trial court did not err in ruling the testimony in this case was admissible and did not require a *Frye* hearing, particularly where the trial judge barred the witnesses from testifying their opinions were "within a reasonable degree of scientific certainty."

¶ 92　　　　　　　　　　　　　　Other-Crimes Evidence

¶ 93　　Defendant further argues the trial court erred in admitting evidence that defendant stated he sold bullets to Collins. Defendant maintains the testimony was irrelevant, other-crimes evidence. Under the common law, other-crimes evidence generally is inadmissible if offered only to demonstrate the defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 169 (2003). Evidence regarding other crimes generally is admissible if offered to prove any relevant fact other than propensity. *Id.* at 170. For example, such other-acts evidence is admissible to show:

> " '*modus operandi*, motive, knowledge, intent, absence of mistake or accident, [the] defendant's state of mind, absence of an innocent mind frame or the presence of criminal intent, circumstances or context of [the] defendant's arrest, placement of [the] defendant in proximity to the time and place of the crime, identification of the weapon used in a crime, consciousness of guilt, to show a common design, scheme or plan, circumstances of a crime charged that would otherwise be unclear, whether a crime charged was actually committed, opportunity or preparation, a defendant's dislike or attitude toward the victim, to explain an otherwise implausible fact relating to the crime charged, to contradict on rebuttal a defendant's denials, to disprove a defense of entrapment and to disprove an alibi defense.' " *People v. Moser*, 356 Ill. App. 3d 900, 913 (2005) (quoting *People v. Millighan*, 265 Ill. App. 3d 967, 972-73 (1994)).

In this case, the State introduced the testimony at issue to show consciousness of guilt. "A false exculpatory statement is 'probative of a defendant's consciousness of guilt.' " *People v. Hommerson*, 399 Ill. App. 3d 405, 410 (2010) (quoting *People v. Shaw*, 278 Ill. App. 3d 939, 951 (1996)). The State argued defendant's statement he sold bullets to Collins was a false exculpatory statement because defendant wanted to avoid revealing any dispute between himself and Collins regarding a gun. We also note defendant's purported sale of bullets also would tend to support defendant's claim Collins had confided in him that other individuals were "f***ing with him"– a claim which, if believed, would divert attention from defendant as a suspect in the shooting. Accordingly, we agree with the State that defendant's statement was relevant and admissible to show consciousness of guilt.

¶ 94        The Admission of Police Testimony Regarding Defendant's Statement

¶ 95        Defendant additionally argues the trial court should have suppressed testimony regarding defendant's statement that he was present at the shooting made in the 5th District lockup area. The State responds defendant has forfeited this issue by failing to raise it in his posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-13 (2010). In general, failure to raise an issue in a posttrial motion forfeits the issue on appeal. *E.g.*, *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Defendant cites *People v. Torres*, 283 Ill. App. 3d 281, 289 (1996), for the proposition that the issue was properly preserved for review by his written motion to suppress which resulted in an evidentiary hearing. The *Torres* court, however, recognized forfeiture existed in that case. *Id.* Moreover, *Torres* relied on *People v. Dickerson*, 69 Ill. App. 3d 825, 828 (1979), which predates *Enoch* and its progeny. When a defendant fails to challenge the denial of his motion to suppress in a posttrial motion, any claimed error relating to the motion to suppress is forfeited. *People v. Cosby*, 231 Ill. 2d 262, 271-73 (2008).

¶ 96        Defendant argues this issue may be reviewed as plain error. Illinois Supreme Court Rule 615(a) creates an exception to the forfeiture rule by allowing courts of review to note "[p]lain errors or defects affecting substantial rights." Under Illinois' plain error doctrine, a reviewing court may consider a forfeited claim when:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Johnson*, 238 Ill. 2d at 484 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

The plain error doctrine is intended to ensure that a defendant receives a fair trial, but it does not guarantee every defendant a perfect trial. *Johnson*, 238 Ill. 2d at 484. Rather than operating as a general savings clause, it is construed as a narrow and limited exception to the typical forfeiture rule applicable to unpreserved claims. *Id.* The burden of persuasion rests with the defendant under both prongs of the plain error analysis. *People v. Sargent*, 239 Ill. 2d 166, 190 (2010). The ultimate question of whether a forfeited claim is reviewable as plain error is a question of law reviewed *de novo*. *Johnson*, 238 Ill. 2d at 485.

¶ 97    Generally, the first step of plain-error review is to determine whether any error occurred. *Thompson*, 238 Ill. 2d at 613. In this case, however, defendant solely relies on the first prong of plain-error review, *i.e.*, a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant. Where the only basis for plain-error review is a claim that the evidence was closely balanced, we need not first look at whether an error occurred. *People v. White*, 2011 IL 109689, ¶ 148. "Where the only basis proffered for plain-error review is a claim that the evidence is closely balanced, an assessment of the impact of an alleged evidentiary error is readily made after reading the record." *Id.* "When it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred." *Id.*

¶ 98    In this case, Collins identified the shooter as "Elliot" from "71st and Champlain." Although the defense produced voting records indicating other individuals with the first or last name of Elliot lived in the vicinity, the State adduced evidence that a database search indicated defendant was the sole Elliot living in the vicinity of 71st Street and Champlain Avenue. Only one of the Elliots identified by the defense resided on Champlain Avenue; he was born in 1912. A trier of fact could reasonably conclude a man of advanced age was unlikely to have been involved in a dispute with Collins over a stolen gun. In any event, there was no evidence that any of the Elliots identified by the defense had any relationship to Collins or to the incident. In contrast, defendant acknowledged to police he knew Collins and Odoms confirmed defendant knew Collins. Kent identified defendant as the shooter in the Kent robbery; the expert testimony established the cartridge cases in the Kent robbery were fired by the same weapon which fired the cartridge cases recovered at the scene in this case.

¶ 99    The remainder of the defense case did not significantly alter this balance of the evidence. The defense produced testimony from Steppe, who did not recognize Collins or any of the individuals he observed running from the scene of the shooting. Detective Crowder recognized only Odoms as one of the individuals at the scene. Odoms had turned away from the scene when he heard gunshots and thus did not witness the shooting. Odoms provided statements to the police referring to Big Mike, but never stated to ASA Gillespie that Big Mike had a gun or identified Big Mike as the shooter. Williams testified defendant was at her house at approximately 4 to 4:20 p.m. on the date of the shooting, well after the paramedics were dispatched at 3:57 p.m. Given this record, we conclude, even if the trial court erred, the evidence was not closely balanced and defendant cannot establish plain error in this case.

¶ 100                    The Questioning of the Jury Venire

¶ 101    Lastly, defendant contends he was denied a fair trial on the ground that the trial court failed to question prospective jurors in accordance with the amended version of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). Supreme Court Rule 431(b) imposes a *sua sponte* duty on trial courts to question prospective jurors, individually or in a group, as to whether they understood and accepted the principles outlined in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), "that a defendant is presumed innocent, that he is not required to offer

any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." See *People v. Haynes*, 399 Ill. App. 3d 903, 912 (2010).

¶ 102    The State responds defendant forfeited this issue by failing to object to the trial judge's questioning of the venire as not substantially complying with Rule 431(b) at the time or in the posttrial motion. Defendant again argues for plain error review, asserting the evidence in this case was closely balanced. For the reasons previously stated, we conclude the evidence was not closely balanced in this case. Accordingly, defendant's argument fails.

¶ 103                                    CONCLUSION

¶ 104    For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 105    Affirmed.